OHIO ROUNDTABLE et al.

v.

TAFT, Governor, et al.

2002-Ohio-3669.]

Court of Common Pleas of Ohio,
Franklin County.

No. 02CVC01–491.

Decided July 15, 2002.

Donald J. McTigue, for plaintiffs.

Betty D. Montgomery, Attorney General, Mark Landes and Elizabeth Luper Schuster, Assistant Attorneys General, for defendants.

DANIEL T. HOGAN, Judge.

{¶ 1} A trial was held in this matter after which the transcript was prepared. The parties then submitted post-trial briefs in accordance with an agreed-upon schedule with some reasonable extensions allowed. After reviewing the evidence presented at trial and the parties' post-trial briefs, the court issues the following decision on the merits of the case.

{¶ 2} In this case, plaintiffs challenge the legitimacy of Ohio's participation in the new multi-state lottery game popularly known as Mega Millions. Plaintiffs

have asserted twelve claims in this case and defendants have asserted the defense of lack of standing.

{¶ 3} The first five claims are declaratory judgment actions that allege violations of Section 6, Article XV of the Ohio Constitution, which generally prohibits lotteries, but makes an exception for state-run lotteries if the entire proceeds go to support public education. Of those five claims, the first three allege that the constitutional requirements for adopting and managing a state-run lottery have not been satisfied. The fourth and fifth claims allege that the entire proceeds from Mega Millions will not go to support public education.

{¶ 4} The sixth claim is a declaratory judgment action that alleges a violation of the Single–Subject Rule of the Ohio Constitution.

{¶ 5} The seventh and eight claims seek writs of mandamus based on the allegations presented in the first five claims.

{¶ 6} The ninth claim, a taxpayer action, has been withdrawn.

{¶ 7} The remaining three claims allege violations of the statute that authorized Ohio participation in multi-state lottery games.

The Rationale for the Constitutional Restrictions on Lotteries

{¶ 8} The Supreme Court discussed the history of Ohio's public policy with regard to lotteries and gambling in *Mills–Jennings of Ohio, Inc. v. Dept. of Liquor Control,* (1982), 70 Ohio St.2d 95, 24 O.O.3d 181, 435 N.E.2d 407:

{¶ 9} "The effort to control gambling in this state is a never ending fight. Historically in Ohio the gambling instinct was considered as an evil in and of itself. As early as the year 1790, by a law passed by the Governor and Judges of the Northwest Territory at Vincennes, it was provided that 'any species of gaming, play or pastime whatsoever' whereby money may be won or lost was prohibited. Likewise the use of billiard tables 'or other gaming tables, or any other machine' for gambling was prohibited. See 1 Chase, Statutes of Ohio 105. Effective October 1, 1795, it was provided that tavern keepers or inn holders were prohibited from permitting 'cards, dice, billiards, or any instrument of gaming to be made use of' on the premises operated by them as such tavern or inn. *Id.,* at page 199 [24 O.O.3d 181, 435 N.E.2d 407].

{¶ 10} "The first Constitution of Ohio, adopted in 1802, made no direct reference to lottery or gambling. In 1805, the General Assembly passed an Act making various forms of gambling illegal. *Id.,* at page 503 [24 O.O.3d 181, 435 N.E.2d 407]. In 1807, it was made an offense to conduct a lottery 'without a special act of the legislature.' 5 Ohio Laws 91. From 1807 to 1828 the General Assembly passed a number of Acts providing for the raising of money, by way of lottery, to make public improvements. In 1830, the General Assembly prohibited

the further use of lotteries or schemes of chance for any purpose, 28 Ohio Laws 37, and this prohibition was carried over into the Constitution adopted in 1851. Section 6, Article XV of the Constitution of 1851 provided that 'lotteries, and the sale of lottery tickets, for any purpose whatever shall forever be prohibited in this State.' It is interesting to note that when the people of the state adopted the Constitution of 1851, nothing therein was said of gaming or gambling as such, or in the Amendments to that Constitution later adopted. The prohibition of the Constitution was against lotteries and the sale of lottery tickets only. As we have seen, the adverse attitude of the General Assembly toward the use of gambling machines or devices was so pronounced, and their use so adverse to the policy of the state, that it apparently was thought unnecessary to write any prohibition thereof into the Constitution. It was only because the legislatures had seen fit to employ the scheme of a lottery for public and private purposes that the people considered it necessary to prohibit lotteries in the Constitution. This is clearly demonstrated by the enactment of Ohio's first anti-gambling provisions, on February 14, 1807, under the title, 'an act, for the prevention of certain immoral practices.' Every '* * * species, kind or way of gambling at hazard or chance, under any pretense whatever, for money or any other article of value, and betting thereon,' were prohibited. 3 Ohio Laws 218. Thus, at the time of the Constitutional Convention of 1851, all gambling, whether games or schemes of chance, was illegal in Ohio.

{¶ 11} "Relying on the foregoing constitutional provisions, courts in Ohio treated the Constitution as broadly prohibiting lotteries in the generic sense, thus extending the threat of unconstitutionality to other games and schemes of chance. Any device or scheme which served to arouse the gambling instinct was equitable with a lottery for the purposes of applying the public policy expressed in the Constitution. Although the courts seldom relied solely on the Constitution in anti-gambling litigation, it was repeatedly invoked as evidencing a strong public policy against gambling while at the same time the conduct was held to be statutorily proscribed. See *Kroger Co. v. Cook* (1970), 24 Ohio St.2d 170 [53 O.O.2d 382, 265 N.E.2d 780]; *Stillmaker v. Dept. of Liquor Control* (1969), 18 Ohio St.2d 200 [47 O.O.2d 437, 249 N.E.2d 61]; and *Westerhaus Co. v. Cincinnati* (1956), 165 Ohio St. 327 [59 O.O. 428, 135 N.E.2d 318]. Thus the general proposition was that just because the Constitution referred only to lotteries, this did not mean that other forms of gambling were allowed.

{¶ 12} "This entire concept was dramatically changed by the state which, through its own initiative, significantly contributed to the weakening of the clear and long-standing anti-gambling public policy in Ohio. The promulgation of the new Ohio Criminal Code in 1974 (and the 1975, 1976, and 1977 amendments thereto) with regard to R.C. Chapter 2915, the constitutional authorization,

effective November 5, 1975, for bingo conducted by a charitable organization for charitable purposes and a lottery operated by the state, added to the already existing pari-mutuel wagering on horse racing, substantially changed the public policy with regard to gambling as it [previously] existed. * * * In addition there is the well-reasoned opinion of Judge Mahoney of the Court of Appeals for Summit County in *State, ex rel. Gabalac, v. Congregation* (1977), 55 Ohio App.2d 96 [9 O.O.3d 242, 379 N.E.2d 242], to now consider."

{¶ 13} In *Gabalac,* the court stated:

{¶ 14} "This assignment [of error] is predicated upon an expanding of the definition of the word 'lottery' to include all gambling. We cannot adhere to this view. A lottery is a scheme whereby a monetary consideration is paid and the winner of the prize is determined by lot or chance. *Stevens v. Cincinnati Times–Star Co.* (1905), 72 Ohio St. 112, 147 [73 N.E. 1058]. A lottery is a species of gambling. The term 'gambling' is broader and encompasses more than the term 'lottery.' *Westerhaus Co. v. Cincinnati* (1956), 165 Ohio St. 327, 339 [59 O.O. 428, 135 N.E.2d 318].

{¶ 15} "* * *

{¶ 16} "The recent amendment of Section 6, Article XV, emphasized above, overcame the prior constitutional inability of the General Assembly to legalize charitable bingo. See, *e.g., Columbus v. Barr* (1953), 160 Ohio St. 209, 212 [52 O.O. 24, 115 N.E.2d 391].

{¶ 17} "We conclude that Section 6, Article XV, prohibits only one type of gambling—namely, lotteries. Therefore, the legislature can pass laws legalizing other forms of gambling."

{¶ 18} While Ohio's public policy against gambling and lotteries may have weakened, it has not entirely disappeared. Even though Ohioans amended their Constitution to allow state-run lotteries in 1973 and charitable bingo in 1975, Ohioans never entirely repealed the ban on lotteries. The original understanding of many supporters of the 1973 amendment that state-run lottery profits would be used for education was incorporated into the Ohio Constitution by a third amendment in 1987.[1] Hence, the nature of these amendments indicates that Ohio still holds to the policy position that lotteries should remain subject to a constitutional ban except in two situations wherein they would serve some important constitutionally identified social purpose.

{¶ 19} While it is undeniable that recreational gambling for those who can afford it has become more socially acceptable than it once was, the suspicion

---

1. Editor's Comment to Section 6, Article XV of the Ohio Constitution, Baldwin's Ohio Revised Code.

which Ohioans have regarding the potential negative effects of gambling was reaffirmed in 1996 when a proposal to amend Ohio's Constitution to allow riverboat casinos was defeated 62 percent to 38 percent.[2] Many arguments in favor of a Constitutional ban on lotteries (and legal prohibition of many other forms of gambling) retain much of their force. Such arguments provide the rationale for the once total, but now partial, ban on lotteries:

{¶ 20} 1. There appear to be certain persons who are more vulnerable to the lure of gambling than others. Indeed, the parties in this case have stipulated that one of the plaintiffs is a "recovering addicted gambler." Because of the large prizes, lotteries can provide a special challenge to such persons.

{¶ 21} 2. Even if one adopts the position that such persons are totally responsible for their gambling conduct and that, therefore, the state should not concern itself with the effects of the gambler's "weak character" on himself/herself, the compulsive gambler's family members and friends, who cannot be regarded as responsible, also suffer.

{¶ 22} 3. The resources of both charitable and public social service agencies end up being used to deal with the effects of excessive gambling, instead of being used for other beneficial purposes for which they might be used if there were no legalized lotteries.

{¶ 23} 4. Gambling has the reputation of being associated with racketeering and organized crime. Gambling, because of its suggestion of easy money, would be especially attractive to persons who are interested in acquiring wealth, but who lack a sense of obligation to return value to others in the form of services or products. Hence, gambling has a reputation for being a magnet for the criminally inclined type of person. Hence, even legalized gambling threatens to become the locus of illegal activity.

{¶ 24} 5. Ill-gotten gains from such illegal activities could then be used as seed money for other illegal ventures.

{¶ 25} 6. Any increased racketeering and organized crime, not to mention the lotteries themselves, increase the opportunities and motives for the corruption of public officials. Because of the large amounts of money involved in state lotteries, not to mention multi-state lotteries, and the fact that results might be subject to being manipulated by a relatively small number of public officials, the temptation for public corruption is present.

{¶ 26} 7. Once a public official has engaged in such corrupt activity, then blackmail and connections with organized crime established in the initial corrupt

---

2. "Riverboat Casinos Vote comes up Snake Eyes," by James Bradshaw, Dispatch Statehouse Reporter, *The Columbus Dispatch,* November 6, 1996, News Local and National at 01A.

enterprise, may make it more difficult for the public official to choose to refuse to engage in further corrupt activity.

{¶ 27} 8. By allowing lotteries and gambling, and especially by sponsoring lotteries and gambling, the state encourages gambling behavior and, thereby, increases the likelihood of all of the negative effects summarized in items 1 through 7.

{¶ 28} When the people of Ohio decided to constitutionally ban lotteries, it was presumably based upon ideas such as these about the likely effects of permitting lotteries.[3] When they later decided to amend the ban three times so as ultimately to allow only two exceptions to the ban which serve important social functions (public education and charity), the people demonstrated that they remain suspicious of lotteries, and are willing to accept the risks associated with partially lifting the constitutional ban on lotteries only when doing so serves some important social function.

{¶ 29} In conclusion, the rationale for retaining the constitutional ban on lotteries, except in the case of charitable bingo and state-run lotteries for the support of public education, is that there remains a suspicion about the potential connection between lotteries and, the corruption of private individuals, private associations, public officials, and ultimately, the public institutions of our republic. It is a suspicion that remains strong enough to provide a rationale for some *constitutional* restriction on lotteries even as some exceptions to the ban are allowed.

### Standing

{¶ 30} Defendants argue that the plaintiffs all lack standing. The issue of standing was discussed by the Ohio Supreme Court in *State ex rel. Ohio*

---

**3.** The Supreme Court's statement that "[h]istorically in Ohio the gambling instinct was considered as an evil in and of itself" should not be read as indicating that the ban on lotteries was not based upon a notion of the likely effects of allowing lotteries. "Deontological" notions of good and evil which make use of terms like good or evil "in and of itself" are sometimes contrasted with "consequentialist" notions of good and evil. Nevertheless, the key role that the "golden rule," or something much like it, plays in such deontological ethics as one finds in Christianity or Kantianism guarantees that consequences play a significant role in the classification of acts or dispositions as good or evil "in themselves." So long as the golden rule, or something akin to it, is used as the principle which distinguishes good acts from evil acts, one would not want others to apply that principle in a manner which turns a blind eye toward the consequences that such acts or dispositions will have upon oneself in one's actual situation in the world. Hence, the golden rule itself requires that the golden rule be applied in a manner that takes into account the consequences of actions that will be visited upon others so long as one would want those consequences to be taken into account if one was in the actual situation that those others are in. Thus, the notion that "in Ohio the gambling instinct was considered as an evil in and of itself" does not imply that this evaluation of "the gambling instinct" was not tied to beliefs about the various effects of that disposition.

*Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, wherein the court said:

{¶ 31} "It is well established that before an Ohio court can consider the merits of a legal claim, the person seeking relief must establish standing to sue. *Ohio Contractors Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 320, 643 N.E.2d 1088, 1089. The concept of standing embodies general concerns about how courts should function in a democratic system of government. As the court explained in *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 257 N.E.2d 371, 372:

{¶ 32} " 'It has been long and well established that it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies. The extension of this principle includes enactments of the General Assembly.'

{¶ 33} "These concerns become more acute where there may be an intrusion into areas committed to another and coequal branch of government. The judicial 'power to declare legislative enactments unconstitutional is not a superior power, neither one of veto nor of greater wisdom. It is rather a power burdened with a duty—a duty to determine in particular cases whether the Legislature has reached and passed the extreme boundary of legislative power.' *Ostrander v. Preece* (1935), 129 Ohio St. 625, 629, 3 O.O. 24, 26, 196 N.E. 670, 672. Thus, the judicial function does not begin until after the legislative process is completed and 'the void law is about to be enforced against a citizen to his prejudice.' Otherwise, if 'no private rights of person or property are in jeopardy, * * * we are simply asked to regulate the affairs of another branch of government.' *Pfeifer v. Graves* (1913), 88 Ohio St. 473, 488, 104 N.E. 529, 533.

{¶ 34} "Accordingly, in the vast majority of cases brought by a private litigant, ' "the question of standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy, as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." ' (Citations and internal quotations omitted.) *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas* (1973), 35 Ohio St.2d 176, 178–179, 64 O.O.2d 103, 105, 298 N.E.2d 515, 516, quoting *Sierra Club v. Morton* (1972), 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636, 641. In order to have standing to attack the constitutionality of a legislative enactment, the private litigant must generally show that he or she has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general, that the law in

question has caused the injury, and that the relief requested will redress the injury. See *Bicking, supra; Willoughby Hills v. C.C. Bar's Sahara, Inc.* (1992), 64 Ohio St.3d 24, 27, 591 N.E.2d 1203, 1205; *Palazzi v. Estate of Gardner* (1987), 32 Ohio St.3d 169, 512 N.E.2d 971, at the syllabus; *Anderson v. Brown* (1968), 13 Ohio St.2d 53, 42 O.O.2d 100, 233 N.E.2d 584, paragraph one of the syllabus; *State ex rel. Lynch v. Rhodes* (1964), 176 Ohio St. 251, 254, 27 O.O.2d 155, 156, 199 N.E.2d 393, 396; *State ex rel. Skilton v. Miller* (1955), 164 Ohio St. 163, 169, 57 O.O. 145, 149, 128 N.E.2d 47, 51; *Zangerle v. Evatt* (1942), 139 Ohio St. 563, 574, 23 O.O. 52, 57, 41 N.E.2d 369, 374. See, generally, 16 Ohio Jurisprudence 3d (1979) 266, 270, Constitutional Law, Sections 134 and 135.

{¶ 35} "In the federal judicial system, where the requirement for injury is grounded in the constitutional requirements of Section 2, Article III of the United States Constitution, the necessity of showing injury in fact prevails irrespective of whether the complaining party seeks to enforce a private or public right. See *Whitmore v. Arkansas* (1990), 495 U.S. 149, 155, 110 S.Ct. 1717, 1722–1723, 109 L.Ed.2d 135, 145; *Secy. of State of Maryland v. Joseph H. Munson Co., Inc.* (1984), 467 U.S. 947, 954, 104 S.Ct. 2839, 2845, 81 L.Ed.2d 786, 794; *Singleton v. Wulff* (1976), 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826, 832; *Sierra Club v. Morton* (1972), 405 U.S. 727, 736–740, 92 S.Ct. 1361, 1367–1368, 31 L.Ed.2d 636, 643–646. However, the federal decisions in this area are not binding upon this court, and we are free to dispense with the requirement for injury where the public interest so demands. 'Unlike the federal courts, state courts are not bound by constitutional strictures on standing; with state courts standing is a self-imposed rule of restraint. State courts need not become enmeshed in the federal complexities and technicalities involving standing and are free to reject procedural frustrations in favor of just and expeditious determination on the ultimate merits.' * * * 59 American Jurisprudence 2d (1987) 415, Parties, Section 30.

{¶ 36} "This court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties.

{¶ 37} "* * *

{¶ 38} "Ordinarily a person is not authorized to attack the constitutionality of a statute, where his private rights have suffered no interference or impairment, but as a matter of public policy a citizen does have such an interest in his government as to give him capacity to maintain a proper action to enforce the performance of a public duty affecting himself and citizens generally.

██ {¶ 39} "The court [in *State ex rel. Newell v. Brown* (1954), 162 Ohio St. 147, 54 O.O. 392, 122 N.E.2d 105] explained that '[w]here a public right, as distinguished from a purely private right, is involved, a citizen need not show any special interest therein, but he may maintain a proper action predicated on his citizenship relation to such public right. This doctrine has been steadily adhered to by this court over the years.' *Id.* at 150–151, 54 O.O. at 393, 122 N.E.2d at 107.

{¶ 40} "* * *

{¶ 41} "Thus, the public action is fully conceived in Ohio as a means to vindicate the general public interest.

{¶ 42} "* * *

 {¶ 43} "The public-right doctrine is, indeed, an exception to the personal-injury requirement of standing. But more than that, 'the public action is conceived as an action to vindicate the general public interest. Not all alleged illegalities or irregularities are thought to be of that high order of concern.' Jaffe, Standing to Secure Judicial Review: Public Actions (1961), 74 Harv.L.Rev. 1265, 1314. Thus, this court will entertain a public action ' "under circumstances when the public injury by its refusal will be serious." ' *State ex rel. Trauger [v. Nash* (1902) ], *supra,* 66 Ohio St. [612] at 616, 64 N.E. [558] at 559, quoting [*People ex rel.*] *Ayres [v. Board of State Auditors*], *supra,* 42 Mich. [422] at 429, 4 N.W. [274] at 279. Similarly, in *State ex rel. Sego v. Kirkpatrick* (1974), 86 N.M. 359, 363, 524 P.2d 975, 979, the Supreme Court of New Mexico held that 'even though a private party may not have standing to invoke the power of this Court to resolve constitutional questions and enforce constitutional compliance, this Court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance.' In *Jenkins v. State* (Utah 1978), 585 P.2d 442, 443, the Supreme Court of Utah held that while it is true that under 'the usual rule * * * one must be personally adversely affected before he has standing to prosecute an action * * *, it is also true this Court may grant standing where matters of great public interest and societal impact are concerned.' "

{¶ 44} The issue for this court is whether the present action should be allowed to proceed as a private action, a public action, neither or both. For the reasons which follow, this court finds that the action should be allowed to proceed as both a private and a public action.

{¶ 45} Some of the plaintiffs allege an injury sufficient to bring a private action.

{¶ 46} The stipulations entered into by the parties indicate that plaintiff John Edgar is the parent of a child who attends a public school in Ohio. The injury alleged in this case is that his child is being deprived of the benefit guaranteed by the Ohio Constitution that all proceeds from lotteries in Ohio shall be used to support public education.

{¶ 47} The stipulations also state that plaintiff Robert Walgate is a recovering addicted gambler. It is further stipulated that his mother, plaintiff Sandra Walgate, has suffered as a result of her son's addiction to gambling. The Ohio Constitution contains a general prohibition against lotteries with two limited exceptions. One of the purposes of the general prohibition against lotteries and some of the limitations on the exceptions to that prohibition are to provide some protection for persons vulnerable to gambling addiction from the temptation presented by lotteries, and to protect their family members from the effects of an active gambling addiction in the family. For example, under the Ohio Constitution, the gambling addict cannot be subjected to the temptation to participate in any legal lottery that does not fall within the strict confines of the exception to the general ban on lotteries. The injury alleged here is that Walgate and his family are being subjected to the added danger of a state-run lottery that does not fall within the strict confines of the exception to the general ban on lotteries in the Ohio Constitution. The Walgates have alleged a sufficient injury.

{¶ 48} The plaintiffs also have standing to bring a "public action." Constitutional protections designed to promote education and prevent public corruption protect the very foundations of our republic. Both education and the absence of public corruption are foundation conditions for a healthy republic. Hence, the allegations presented in this case are matters of great public importance. Therefore, it is appropriate to allow a public action in this case.

{¶ 49} In conclusion, the court finds that the plaintiffs have standing to pursue their claims.

{¶ 50} Since a court ought to avoid deciding a case on constitutional grounds if the case can be decided on statutory grounds, this court will begin by analyzing plaintiffs' statutory claims (i.e., plaintiffs' tenth, eleventh, and twelfth claims).

Plaintiffs' Tenth Claim Regarding the Validity of the Lottery Commission's Administrative Rules for the Mega Millions Lottery

{¶ 51} Plaintiffs argue that the rules promulgated by the commission are invalid because the procedures required by R.C. Chapter 119 for the adoption of administrative regulations were initiated on February 14, 2002, one month prior to the March 14, 2002 effective date of the statute authorizing the Lottery Commission to promulgate the rules for a multi-state lottery. Plaintiffs argue

that the commission did not have the power (or, in other words, the authority) to initiate the Chapter 119 rule making procedures until the effective date of the statute.

{¶ 52} Administrative agencies of the state have only so much power as has been granted to them by the General Assembly. *Burger Brewing Co. v. Thomas* (1975), 42 Ohio St.2d 377, 71 O.O.2d 366, 329 N.E.2d 693. As to whether a particular power has been delegated by the General Assembly to an administrative agency, the following statement in *State ex rel. A. Bentley & Sons Co. v. Pierce* (1917), 96 Ohio St. 44, 47, 117 N.E. 6, is pertinent:

{¶ 53} "Such grant of power, by virtue of a statute, may be either express or implied, but the limitation put upon the implied power is that it is only such as may be reasonably necessary to make the express power effective. In short, the implied power is only incidental or ancillary to an express power, and, if there be no express grant, it follows, as a matter of course, that there can be no implied grant. In construing such grant of power, particularly administrative power through and by a legislative body, the rules are well settled that the intention of the grant of power, as well as the extent of the grant, must be clear; that in case of doubt that doubt is to be resolved not in favor of the grant but against it. It is one of the reserved powers that the legislative body no doubt had, but failed to delegate to the administrative board or body in question."

{¶ 54} In order to ascertain what powers the Lottery Commission had on February 14, 2002, we should look not only to H.B. No. 405 ("H.B. 405"), which gave the commission power to promulgate rules governing a multi-state lottery, but also to Chapter 119. Since H.B. 405 would not be effective until March 14, 2002, it did not confer any powers on the commission that could be used in February. Nevertheless, that does not foreclose the possibility that Chapter 119 might implicitly grant the power to initiate (but not conclude) rule-making procedures for the purpose of developing rules that would implement a given statute that has been enacted but has not yet become effective.

{¶ 55} R.C. 119.02 states: "Every agency authorized by law to adopt, amend, or rescind rules shall comply with the procedure prescribed in sections 119.01 to 119.13, inclusive, of the Revised Code, for the adoption, amendment, or rescission of rules." Even before March 14, the commission was an agency that was authorized to adopt rules. Hence, the commission was required to comply with the procedures of R.C. 119.01 to 119.13 prior to March 14 whenever it engaged in making rules. But the duty to do something implies the power to do it. Hence, R.C. 119.02, which was applicable before March 14, must be regarded as granting the commission the power to comply with the procedure prescribed by R.C. 119.01 to 119.13.

{¶ 56} Clearly, that grant of power is not sufficient to give the commission power to actually adopt a rule on a subject matter with regard to which it has not been given specific authority, since such a broad grant of legislative power to an administrative agency would be unconstitutional. But, there is no similar constitutional infirmity that would apply to a grant of the power to initiate the process of making rules on a specific subject matter prior to the effective date of the statute granting the power to adopt rules on the specific subject matter so long as the rules are not actually adopted until after the effective date of the statute.

{¶ 57} Hence, the issue is whether the power to comply with procedures required by R.C. 119.01 to 119.13 includes the power to comply with the initial procedural requirements after a statute has been enacted giving authority to make rules on a specific subject but before that statute has become effective. This court finds that it does.

{¶ 58} "The purpose of the administrative rule-making process provided for by R.C. Chapter 119 is 'to permit a full and fair analysis of the impact and the validity of a proposed rule.'" Hence, the purpose is not to delay the implementation of statutes by delaying the adoption of rules for their implementation. To the contrary, since it must be supposed that the legislature intended a reasonable result, it must be supposed that Chapter 119 was intended to provide an efficient process for the implementation of statutes rather than a process that would unnecessarily delay the implementation of statutes. (See R.C. 1.47.) This court is unaware of any benefit that would be gained by delaying the initiation of the rule-making process until after a statute becomes effective.

{¶ 59} Consequently, this court finds that the power granted by R.C. 119.02 to comply with the requirements of R.C. 119.01 to 119.13 includes the power to initiate the rule-making process after the substantive statute is enacted, but before that statute becomes effective, even though the rule cannot be adopted until after the statute becomes effective.

{¶ 60} Given that finding, this court hereby DECLARES that the administrative rules originally filed by the Lottery Commission on February 14, 2002, are not invalid because of being filed prior to the effective date of H.B. 405.

Plaintiffs Twelfth Claim Regarding Whether Director Kennedy was
Designated as an Authenticating Officer and Signed the Mega
Millions Agreement as an Authenticating Officer

{¶ 61} Plaintiffs concede that defendants have cured the alleged defect that was the subject of their twelfth claim. On May 13, two days before the initial Mega Millions lottery tickets were scheduled to go on sale, the Governor signed and filed the necessary papers to make Director Kennedy an Authenticating Officer with the power to sign multi-state lottery agreements as an authenticating

officer for the Governor. Director Kennedy then proceeded to sign the Mega Millions agreement as an authenticating officer.

Plaintiffs' Eleventh Claim regarding whether the Governor Acted Prematurely in Directing the Director to Enter Into a Multi–State Lottery Agreement

And

Plaintiffs' First Claim Regarding Whether H.B. 405 Unconstitutionally Delegated to the Governor the Power to Authorize an Agency of the State to Conduct Lotteries

{¶ 62} H.B. 405 amended R.C. 3770.02 to provide:

{¶ 63} "(J)(2) If the governor directs the director to do so, the director shall enter into an agreement with other lottery jurisdictions to conduct statewide joint lottery games. If the governor signs the agreement personally or by means of an authenticating officer pursuant to section 107.15 of the Revised Code, the director then may conduct statewide joint lottery games under the agreement."

{¶ 64} Section 6, Article XV of the Ohio Constitution says, among other things: "The General Assembly may authorize an agency of the state to conduct lotteries."

{¶ 65} For their First Claim, plaintiffs argue that R.C. 3770.02(J)(2) unconstitutionally delegates the General Assembly's legislative power with regard to authorizing an agency of the state to conduct lotteries. For their Eleventh Claim, plaintiffs argue that the Governor's attempt to direct the Director to enter into the agreement occurred before the statute became effective, and, therefore, before the Governor had the power to direct the Director to enter into the agreement.

{¶ 66} These two claims shall be analyzed together because they are both based upon the same mistaken interpretation of R.C. 3770.02(J)(2).

{¶ 67} Section 5, Article III of the Ohio Constitution says: "The supreme executive power of this State shall be vested in the governor." Hence, the power to enter into agreements with other states resides with the Governor. R.C. 3770.02(J)(2) does not delegate legislative power to the Governor, but, rather, it recognizes that Ohio's participation in any multi-state lottery must be conditional upon the Governor's exercising the Governor's executive power with regard to deciding whether to enter into agreements with other states.

{¶ 68} Furthermore, since the Governor's power to decide whether Ohio will enter into an agreement with other states is grounded in the Constitution and exists independently of R.C. 3770.02(J)(2), the Governor had authority to

direct the Director to enter into the multi-state lottery agreement even before the effective date of H.B. 405. This court does not mean that the Agreement would have been a legal contract if the Director had signed it prior to the statute's effective date, but only that the Governor did not have to wait for that date to tell his staff what to do once a legal contract could be formed.

{¶ 69} While Section 6, Article XV of the Ohio Constitution gives the General Assembly the power to authorize an agency of the state to conduct lotteries, nothing therein precludes the possibility that some other constitutional provision might provide a second precondition for some or all types of lotteries. By conferring the supreme executive power on the Governor, Section 5, Article III implicitly creates a second precondition in the case of multi-state lotteries, since such lotteries can occur only if the Governor decides that Ohio will enter into the necessary agreement with other states.

{¶ 70} The court hereby DECLARES that the Governor did not act prematurely when, before the effective date of H.B. 405, he authorized the director to enter into the multi-state lottery agreement. In addition, the court hereby DECLARES that the General Assembly did not unconstitutionally delegate its authority to authorize a state agency to conduct a lottery.

### Plaintiffs' Seventh, Eighth, and Ninth Claims

{¶ 71} Plaintiffs' Seventh and Eighth Claims seek writs of mandamus. Plaintiffs and defendants agree that a prerequisite for such relief is that there be no adequate remedy at law. Since this court found that plaintiffs have standing for their declaratory judgment actions that seek the same injunctive and declaratory relief as the mandamus actions, plaintiffs have an adequate remedy at law. Thus, the requests for writs of mandamus set forth in the Seventh and Eighth Claims are both DENIED.

{¶ 72} Plaintiffs have withdrawn their Ninth Claim. Therefore, the plaintiffs' Ninth Claim is DISMISSED.

### Plaintiffs' Second Claim that the General Assembly Has Unlawfully Delegated its Authority to Other States

{¶ 73} Plaintiffs argue that, "[b]y its nature, a multi-state lottery requires mutual agreement by the participating states permitting each other to take part in the game." They conclude that when the General Assembly enacts a statute authorizing a multi-state lottery, the General Assembly delegates its authority to authorize a multi-state lottery to the other states. Plaintiffs argue that such a delegation of authority is unconstitutional because, "under Section 6, Article XV of the Ohio Constitution, only the General Assembly may authorize an agency of the state to conduct a lottery game or games." The argument is unpersuasive.

{¶ 74} Actually, nothing in the Constitution says that "only" the General Assembly can "authorize" a lottery. Consider what the Ohio Constitution actually does. First, it bans lotteries and then it allows two exceptions to the ban. One of the exceptions is for state-run lotteries with the proceeds going to public education. The Constitution permits such state-run lotteries only if the General Assembly authorizes "an agency of the state to conduct lotteries." Hence the General Assembly's authority in this regard is indeed unique in that only the General Assembly can satisfy one of the prerequisites for a constitutionally legitimate lottery by authorizing a state agency to conduct the lottery. However, the Constitution does not preclude the possibility that some other parties might have authority which is a condition for the mere existence of a given lottery game. It precludes the possibility only that such other parties would have the authority necessary to make the lottery constitutionally legitimate under the Ohio Constitution.

{¶ 75} When the General Assembly authorized the Ohio Lottery Commission to conduct a multi-state lottery, it did not transfer to the other states the General Assembly's constitutionally granted power to transform a lottery into a constitutionally permitted lottery by authorizing the Ohio Lottery Commission to conduct the lottery, but, rather, to the extent that the General Assembly provided the other states with some power to authorize Ohio's participation in a multi-state lottery, the power transferred was only the power to contractually authorize Ohio's participation. In other words, the type of authority transferred is not the type of constitutional authority that was exercised by, and retained by, the General Assembly. The authority received was not sufficient to enable the other states to make the multi-state lottery constitutional under the Ohio Constitution. Without the authorizing Act of the Ohio General Assembly, the multi-state agreement would be unconstitutional under the Ohio Constitution, and no power has been transferred to the other states by which they could make it constitutional.

{¶ 76} Nothing in the Ohio Constitution says or implies that the Ohio General Assembly cannot authorize a state agency to conduct a lottery that happens to be of a sort that cannot exist except for the cooperation or contractual agreement of other parties. Therefore, this court hereby DECLARES that H.B. 405 did not delegate to other states that part of the General Assembly's authority that, under the Ohio Constitution, may be possessed only by the General Assembly.

Plaintiffs' Third Claim that the Ohio Lottery Commission Will Not Conduct Any Multi–State Lottery Game in its Entirety

{¶ 77} Section 6, Article XV of the Ohio Constitution allows a state-run lottery only if the General Assembly authorizes an agency of the state to

"conduct" the lottery. Plaintiff argues that Ohio's participation in the Mega Millions lottery is unconstitutional because the state agency designated by the General Assembly, the Ohio Lottery Commission, will not be "conducting" the lottery. Rather, it is argued, Mega Millions will be "conducted" by the "consortium" of states that have joined that multi-state lottery.

{¶ 78} There is some support for plaintiffs' argument in the Amended and Restated Multi–State Lottery Agreement submitted as Exhibit ZZ. Paragraph 1. states,

{¶ 79} "The Party Lotteries [i.e., the Ohio Lottery Commission and its counterparts in the other participating states] hereby agree to jointly operate a multi-state lottery game known as Mega Millions * * * which shall be conducted in accordance with game rules, operating procedures, and internal control procedures developed by the Party Lotteries and adopted by the Party Lotteries or incorporated into their existing rules, regulations."

{¶ 80} The "rules, operating procedures, and internal controls" are referred to again in paragraph 19, which states:

{¶ 81} "The Party Lotteries agree and understand that each of the following documents, together with any amendments thereto, is hereby incorporated by reference into this Agreement:

{¶ 82} "i) Mega Millions Official Game Rules effective May 15, 2002;

{¶ 83} "ii) Finance and Operations Procedures for Mega Millions effective May 15, 2002;

{¶ 84} "iii) On Line Drawing Procedures for Mega Millions effective May 15, 2002.

{¶ 85} "The Party Lotteries also agree that the complete Agreement between the parties, which defines the rights and obligations of each party, consists of this Agreement as well as each of the documents listed above, and that each Party Lottery is obligated to perform responsibilities set forth in each of those documents listed above to the same extent that it is obligated to perform responsibilities specifically set forth in this agreement."

{¶ 86} Any further development of such "rules, operating procedures, and internal controls" would presumably be by means of the procedures set forth in Paragraphs 4.1 and 4.2, which state:

{¶ 87} "4.1 For matters requiring a vote of the Party Lotteries, each Party Lottery shall have one vote.

{¶ 88} "4.2 Except for jackpot setting, and except as otherwise provided herein, simple majority vote of all Party Lotteries which are signatories to this Agreement is required to allow any action by the Party Lotteries."

{¶ 89} Hence, Mega Millions is to be governed by the whole group of Party Lotteries by way of majority vote. Plaintiffs have referred to this group as a "consortium." Merriam Webster's on-line Collegiate Dictionary (www.m-w.com) defines "consortium" as "an agreement, combination, or group (as of companies) formed to undertake an enterprise beyond the resources of any one member." The label is appropriate. Hence, this court finds that the Mega Millions lottery is governed by a consortium of party lotteries.

{¶ 90} Defendants argue that the Ohio Lottery Commission has the power to opt out of the agreement at any time. The agreement provides the commission with oversight abilities because it provides for audits of lottery transactions in each participating state in accordance with agreed-upon procedures. The agreement includes a conflict of laws paragraph that states, "In the event of conflict between this Agreement and the constitution, statutes, rules or regulations of any Party Lottery, the Party Lottery's constitution, statutes, rules and regulations shall control."

{¶ 91} This latter clause probably does not give the Ohio Lottery Commission the right under the agreement to pass regulations that would conflict with the terms of the agreement unless such regulations are required by the Constitution or statutory law of Ohio. Nevertheless, this court believes that the Ohio Lottery Commission would have sufficient control and oversight to satisfy the constitutional requirement that it conduct the lottery if, indeed, the Ohio Lottery Commission has the power to withdraw from the Mega Millions Agreement without repercussions at any time.

{¶ 92} There can be no bright-line test as to when the Ohio Lottery Commission has delegated so much of its control over a lottery that it can no longer be regarded as "conducting" the lottery. Any time the commission contracts with another party to do something with regard to a lottery, the commission gives up some control over some aspect of the lottery. No one suggests that the commission cannot contract with other parties to do something with regard to a lottery. Hence, the constitutional issue is whether the commission has retained sufficient control to satisfy the Ohio Constitution. In determining whether sufficient control has been retained, the court should be concerned with the purpose of the constitutional requirement that a state agency "conduct" any state lottery. As already noted, the constitutional limitations on lotteries are generally for the purpose of avoiding corruption. The history of the enactment of the requirement that state lotteries be conducted by a state agency suggests that the intent was to avoid having state lotteries that were conducted by private enterprises. Hence, in this case, where some powers of control were delegated to other states rather than to private enterprises, the delegation is more compatible with the requirement that the lottery be conducted by an agency of the state of

Ohio than a similar delegation to a private enterprise. In this case, where the Lottery Commission has powers of oversight over the lottery which it has found to be adequate, and where powers of control that have been delegated to sister states which the Lottery Commission has determined it can trust for such purposes, this court finds that the Ohio Lottery Commission has retained sufficient control over the lottery so long as the Ohio Lottery Commission has the power to withdraw from the agreement without repercussions at any time it believes that the lottery is being operated in a manner that is not appropriate for the state of Ohio.

{¶ 93} Initially, the multi-state lottery is to be run in accordance with rules and regulations to which the Ohio Lottery Commission has agreed. Hence no rule or regulation is being imposed upon the operation of the multi-state lottery to which the Ohio Lottery Commission has not voluntarily agreed. So long as the Lottery Commission has the power to withdraw from participation from the multi-state lottery agreement at will without repercussions, the multi-state lottery consortium would have no power to impose any rules or regulations upon the operation of the lottery that could be enforced while Ohio is a participant unless the Ohio Lottery Commission permits them to be enforced by remaining a participant in the multi-state lottery. If the consortium attempted to impose any rules or regulations that the Ohio Lottery Commission did not voluntarily agree to be bound by, the commission could withdraw from the multi-state lottery.

{¶ 94} Furthermore, if the Ohio Lottery Commission lost confidence in the other Party Lotteries' ability to avoid corruption, or otherwise determined that the manner in which they were conducting the multi-state lottery in their states did not satisfy standards which are appropriate for a lottery in which the state of Ohio participates, the Ohio Lottery Commission could withdraw from the multi-state lottery.

{¶ 95} Therefore, if the Ohio Lottery Commission has the right to withdraw from the multi-state lottery at will without repercussions, then the Ohio Lottery Commission can terminate Ohio's participation in the multi-state lottery if that lottery fails in any way to satisfy the Ohio Lottery Commission's own views and standards regarding the avoidance of corruption. At the same time, the Ohio State Lottery Commission will have the power to conduct the Ohio portion of the multi-state lottery in accordance with the laws of Ohio and the rules and regulations of the multi-state lottery (voluntarily assented to in the manner previously discussed) that do not conflict with the laws of Ohio. Hence, this court finds that if the General Assembly has exhibited through its legislative action that it is the will of the people that the Ohio Lottery Commission be authorized to conduct a multi-state lottery, and if the Ohio Lottery Commission has voluntarily entered into a multi-state lottery agreement in which the only other "party

lotteries" are Ohio's sister states, then if the Ohio Lottery Commission has retained the right to withdraw Ohio from the multi-state lottery at will without repercussions, then the Ohio Lottery Commission has retained the means necessary to fulfill its constitutional function of protecting the state and its citizens by maintaining *adequate* control over any factors that might encourage or permit the growth of corruption. Hence, under such circumstances, the Ohio Lottery Commission should be regarded as "conducting" the multi-state lottery for purposes of the Ohio Constitution. This conclusion is based in part upon the deference that this court must exercise in favor of the judgments of the legislative and executive branches of state government. The court cannot hold an Act of the legislature unconstitutional unless it finds, beyond a reasonable doubt, that the Act is unconstitutional.

{¶ 96} The above discussion is premised upon the assumption that the Ohio Lottery Commission has the right to withdraw Ohio from the multi-state lottery at will without repercussions. However, paragraph 14.1 of the Agreement says that "Party lotteries may withdraw from Mega Millions upon six (6) months' prior written notice to the other Party Lotteries." Paragraph 14.3 states, "Withdrawal or termination for any reason does not cancel any obligation to the other Party Lotteries which the departing Party Lottery incurred prior to the withdrawal or termination date regardless of the time which such obligation becomes due." Paragraph 5 states, "Any and all joint start-up costs, together with any and all joint operating costs associated with Mega Millions after its commencement, excluding prize liability as defined below, shall be shared equally by each Party Lottery and paid in a manner as agreed to by the Party Lotteries."

{¶ 97} If the six-month notice period of paragraph 14.1 is enforceable against the Ohio Lottery Commission, then the Ohio Lottery Commission does not have the right to withdraw from the multi-state lottery at will and without repercussions. Rather, the Ohio Lottery Commission would be required to remain a participant for six months after it had made a determination that the further participation of Ohio was inappropriate. Even if Ohio were to cease ticket sales for that six months, Ohio would be liable for joint operating expenses, while not having the associated lottery income to cover those expenses, even though the Ohio Lottery Commission had determined that there was something inappropriate about the lottery. Furthermore, the lottery would continue to be conducted by the consortium during that six months in a manner in which the Ohio Lottery Commission might judge to be inappropriate. Thus, if the six-month notice period is enforceable against the Ohio Lottery Commission, then the Ohio Lottery Commission does not have sufficient control over the multi-state lottery so as to satisfy the constitutional requirement that the Ohio Lottery Commission "conduct" that lottery. Thus, the sixth-month notice period requirement of the

multi-State Lottery Agreement conflicts with the requirement of the Ohio Constitution that the Ohio Lottery Commission "conduct" any state lottery in Ohio.

{¶ 98} Both paragraphs 9.1 and 18 state that in the event of a conflict between the agreement or a provision of the agreement and the constitution of any Party Lottery, that Party Lottery's constitution shall control. Therefore, the six-month notice period of paragraph 14.1 is not enforceable against Ohio or the Ohio Lottery Commission. The Ohio Lottery Commission has the right to withdraw from multi-state lottery agreement at will, without repercussions, and with such withdrawal to be effective immediately upon the exercise of that right.[4]

{¶ 99} In conclusion, since the Ohio Lottery Commission has such a right, this court hereby DECLARES that the Ohio Lottery Commission has retained sufficient control over the Mega Millions multi-state lottery so that it can satisfy the constitutional requirement that the Ohio Lottery Commission "conduct" any lottery in Ohio other than charitable bingo.

Plaintiffs' Fourth Claim that the Entire Net Proceeds of
the Multi–State Lottery Will Not be Deposited Into
the Ohio's Lottery Profit Education Fund

{¶ 100} The Ohio Constitution requires that the "entire net proceeds" from any lottery conducted by the Ohio State Lottery Commission be deposited into a specific fund. That fund has come to be known as the Lottery Profit Education Fund. Plaintiffs argue that since the portions of the multi-state lottery proceeds that are raised through ticket sales in any state will remain in that state, the "entire net proceeds" from the multi-state lottery will not be deposited into Ohio's Lottery Profit Education Fund. The argument is not persuasive.

{¶ 101} It is not necessarily true that for any transaction "the entire net proceeds" of that transaction will be the same for one party to the transaction as it is for another. What may be the "entire net proceeds" for one party might be part of the expenses of another. For example, in the process of constructing a

---

4. The same result, that the Ohio Lottery Commission has a right to withdraw from the multi-state lottery at will without notice and without further repercussions, follows if any withdrawal by the Ohio Lottery Commission is a withdrawal "by operation of law." The agreement provides an exception to the six-month notice requirement when the withdrawal is "by operation of law." Arguably, any withdrawal by the Ohio Lottery Commission is a withdrawal "by operation of law" because the constitutional requirement that the Ohio Lottery Commission "conduct" any lottery (other than charitable bingo) in Ohio effectively mandates by law that Ohio must immediately withdraw from a multi-state lottery at any time that the commission determines, for whatever reason, that Ohio should no longer participate in the multi-state lottery.

business, what counts as "the entire net proceeds" for a subcontractor will be part of the expenses of the general contractor.

{¶ 102} With regard to the multi-state lottery at issue, what counts as the "entire net proceeds" from the multi-state lottery for the consortium is not the same as what counts as the "entire net proceeds" from the multi-state lottery for the state of Ohio. In order for the state of Ohio to be part of the multi-state lottery it must enter into a contractual agreement with the other states, and, therefore, it must provide those other states with consideration. The primary consideration provided to the other states is set forth in Paragraph 8 of the Agreement: "Mega Millions revenues not allocated to prizes or paid as joint operating expenses and generated within each Party lottery shall remain in that Party Lottery for distribution in accordance with its constitutional, statutory, and/or regulatory requirements."

{¶ 103} If the Ohio Lottery Commission is conducting the multi-state lottery as we have already determined that it is, then if Ohio must allow the other states to retain a portion of the multi-state revenues as a condition of there being a multi-state lottery, then those funds provided to the other states constitute an expense for the state of Ohio. Hence, that expense must be included when computing Ohio's "entire net proceeds" from the multi-state lottery. As a consequence, Ohio's "entire net proceeds" from the multi-state lottery game will be precisely that portion of the multi-state lottery revenue that Paragraph 8 allows Ohio to retain to be distributed as required by Ohio's Constitution and statutes. Consequently, the multi-state lottery agreement permits Ohio's "entire net proceeds" to be deposited into Ohio's Lottery Profit Education Fund as the Ohio Constitution requires.

{¶ 104} To this it might be responded that the word "entire" is meant to entail that not just Ohio's net proceeds, but all net proceeds from the multi-state lottery, regardless of whose net proceeds they are, must be deposited into Ohio's Lottery Profit Education Fund. However, that cannot be what the Constitution means. If it did, then some convenience store in Niles, Ohio, that is paid commissions to sell lottery tickets and therefore obtains some of its own revenues through the sale of lottery tickets would have to deposit its net proceeds from the sale of lottery tickets into Ohio's Lottery Profit Education Fund.

{¶ 105} Since the Ohio Constitution does not mean that everyone's net proceeds from a lottery must be deposited into the fund, then it must mean that someone's entire net proceeds must be deposited into the fund. Hence, the question for this court is whether it is Ohio's "entire net proceeds" or the consortium's "entire net proceeds" that must be deposited into the Ohio Lottery Profit Federation Fund.

{¶ 106} The latter choice might be preferred if one interprets the requirement as requiring that the "entire net proceeds" derived directly from a lottery must be deposited in the Ohio Lottery Profit Federation Fund. That might remove the burden of the requirement from the convenience store in Niles. But, of course, the words "derived directly" are not included in the Constitution. This court knows of no reason to prefer such an interpretation to the alternate interpretation that would interpret the requirement as requiring that Ohio's "entire net proceeds" from a lottery must be deposited in the Ohio Lottery Profit Federation Fund.

{¶ 107} The only effective difference that this court is aware of between the two interpretations is that the former would serve to effectively prevent the Ohio Lottery Commission from conducting a lottery in the form of a joint venture even if the General Assembly and the commission had determined that the commission could satisfy the other constitutional standards and ends such as (1) the commission retaining sufficient control so as to be "conducting" the lottery, (2) maximizing the amount to be deposited in the Ohio Lottery Profits Fund, and (3) maintaining appropriate standards with regard to avoidance of corruption. If it was the purpose of this provision of the Ohio Constitution to prevent such joint ventures, even if the other constitutional standards were satisfied, then that purpose could have easily been accomplished with clearer language.

{¶ 108} Since this court cannot declare a statute to be unconstitutional unless it is beyond a reasonable doubt that it is unconstitutional, this court hereby DECLARES that where the legislature authorizes the Ohio Lottery Commission to conduct a multi-state lottery, the Constitution does not require that the multi-state consortium's entire net proceeds must be deposited into Ohio Lottery Profit Education Fund. Rather, the constitutional requirement is that Ohio's "entire net proceeds" from the multi-state lottery must be deposited into the fund.

Plaintiffs' Fifth Claim that H.B. 405 Circumvents the Constitutional
Requirement that the Entire Net Proceeds of Ohio Lotteries
be Used for Education Programs

{¶ 109} Section 36 of H.B. 405 provides:

{¶ 110} "CONDITIONAL TRANSFER TO THE LOTTERY PROFITS EDUCATION FUND GROUP

{¶ 111} "Upon approval by the Governor and the Ohio lottery to join a multijurisdictional lottery:

{¶ 112} "* * *

{¶ 113} "(2) The Director of Budget and Management shall increase the fiscal year 2003 appropriation authority in the Department of Education Lottery Profit

Education Fund (017) ALI 200–612, Base Cost Funding, by $41,000,000. This amount is hereby appropriated. The Director of Budget and Management shall also decrease the fiscal year 2003 appropriation authority in the Department of Education GRF ALI 200–501, Base Cost Funding, by $41,000,000."

{¶ 114} This provision gives the Department of Education authority to spend $41,000,000 from one fund and then immediately reduces the Department of Education's authority to spend $41,000,000 from another fund, thereby allowing the General Assembly to appropriate $41,000,000 to noneducation spending, thereby facilitating the balancing of the state's general budget. Plaintiffs argue that "[t]he foregoing provision exchanges funds appropriated for education programs with anticipated proceeds from a multi-state lottery, indirectly using the proceeds from the lottery to fund non-education programs in violation of Art. XV, § 6 of the Ohio Constitution." This court agrees. Proceeds from the multi-state lottery are not being used *"solely"* to support public education as required by the Ohio Constitution; they are *also* being used to facilitate the balancing of the state's general budget.

{¶ 115} It is not reasonable to suppose that the people of Ohio went to the trouble of amending their Constitution in 1987, changing the allocation of lottery proceeds from the state's general revenue fund to a special fund for public education, and requiring that that fund be used "solely for the support" of public education, merely for the purpose of requiring a formal accounting procedure that would not materially benefit public education. It is not reasonable to suppose that the only thing intended to be accomplished for public education by the 1987 amendment was a requirement that if the General Assembly wanted to use lottery funds for the purpose of facilitating the balancing of the state budget, it merely need make two formal allocations as done in H.B. 405 rather than the one allocation it would have made prior to the amendment.

{¶ 116} A review of the history of the amendments to Section 6, Article XV serves to confirm what is already obvious, that the 1988 amendment was meant to materially benefit public education rather than merely require an accounting formality that would still allow the General Assembly to use lottery proceeds to balance the state's general budget.

{¶ 117} Originally, the constitutional ban on lotteries was a complete ban. Then, Section 6, Article XV was amended, effective July 1, 1973, to allow an exception to the ban on lotteries, that "the General Assembly may authorize an agency of the state to conduct lotteries, to sell rights to participate therein, and to award prizes by chance to participants, provided the entire net proceeds of any such lottery are paid into the general revenue fund of the state."

{¶ 118} Section 6, Article XV was amended again, effective November 4, 1975, to allow that "the General Assembly may authorize and regulate the operation of bingo to be conducted by charitable organizations for charitable purposes."

{¶ 119} Finally, Section 6, Article XV was amended a third time, effective January 1, 1988, to restrict the use of lottery proceeds by the state. The relevant provision now states:

{¶ 120} "The General Assembly may authorize an agency of the state to conduct lotteries, to sell rights to participate therein, and to award prizes by chance to participants, provided that the entire net proceeds of any such lottery are paid into a fund of the state treasury that shall consist solely of such proceeds and shall be used *solely* for the *support* of elementary, secondary, vocational, and special education programs as determined in appropriations made by the General Assembly." (Emphasis added.)

{¶ 121} Those who supported the 1988 amendment by a greater than 3–1 majority[5] wanted to make sure that lottery proceeds would benefit public education and that those proceeds could be used for no other purpose. Consider the following pre-election endorsement of the proposed amendment by the Columbus Dispatch:

{¶ 122} "Approval of State Issue 1 on the Nov. 3 ballot would amend the Ohio Constitution to require that all money from the state lottery go to public education. The Dispatch recommends that voters approve this issue.

{¶ 123} "When the proposal for a state lottery was introduced in the Ohio General Assembly in 1973, the bill called for proceeds to go to education. But the Senate amended it so the money would go to the general fund. Nonetheless, the impression had been implanted with the public that profits would be used for education.

{¶ 124} "This mistaken impression persisted for nearly a decade. So strong was the popular sentiment for this use of lottery funds, that the legislature in 1983 directed that lottery profits be used in this way.

{¶ 125} "Approval of Issue 1 would merely ensure that lottery profits be used for the purpose that they are now. *And they could be used for no other purpose.*"[6] (Emphasis added.)

---

5. "Election Results," *The Columbus Dispatch*, 11/5/1987, Local and National News 3B.

6. "For Issue 1," *The Columbus Dispatch*, 10/29/87, Editorial 6A.

{¶ 126} James Bradshaw, the Dispatch's statehouse reporter, wrote that the amendment's backers "hope this issue will dispel public perception that lottery dollars somehow are being used for other purposes." [7]

{¶ 127} In Baldwin's Ohio Revised Code, the Editor's Comment to Section 6, Article XV states:

{¶ 128} "In the belief that the lottery proceeds would be applied to increase state support for schools and teacher salaries (even though the proposal did not earmark the proceeds), public school authorities and teacher organizations campaigned enthusiastically for adoption of the amendment. They were disappointed however, in the increase in school support forthcoming after the Ohio Lottery was instituted, and were instrumental in securing adoption of the 1988 amendment mandating the use of the proceeds solely for support of the schools."

{¶ 129} In conclusion, when the constitutional ban on lotteries was amended to allow state run lotteries, it was with the perception that the proceeds would be used to benefit public education. That perception was of great importance because it provided the justification of why Ohioans were willing to accept the risks of corruption associated with allowing a lottery. When there was an ongoing perception that lottery profits were not being used solely to materially benefit education, the people of Ohio amended the Ohio Constitution again to make explicit the requirement that proceeds be used solely for public education. For this court now to interpret that amendment as requiring only an accounting formality, which in no way prevents the General Assembly from using lottery proceeds to accomplish whatever purposes it chooses, would render the action of the people of Ohio fruitless.

{¶ 130} Therefore, this court hereby finds that the following sentence in H.B. 405, Section 36, is unconstitutional since it causes lottery proceeds to be used for purposes other than merely to support public education:

{¶ 131} "The Director of Budget and Management shall also decrease the fiscal year 2003 appropriation authority in the Department of Education GRF ALI 200–501, Base Cost Funding, by $41,000,000."

{¶ 132} Furthermore, this court finds that this sentence ought to be severed from the remainder of H.B. 405. The multi-state lottery was enacted to help the state resolve its budget problems in general. While this court has found that multi-state lottery proceeds cannot be used to resolve the state's budget problems relating to noneducation expenditures, that does not prevent those

---

7. "Use of Lottery Profits at Issue," by James Bradshaw, Dispatch Statehouse Reporter, *The Columbus Dispatch*, 11/1/1987, Special Sections 2I, Voters Guide.

proceeds from being used to resolve budget issues in that part of the budget pertaining to public education.[8]

{¶ 133} The General Assembly has shown its willingness to use a multi-state lottery for budgetary expenditures in general. The people have exhibited their will that education expenditures should have a higher priority than noneducation expenditures. Hence, it is more likely that the General Assembly would prefer to retain the multi-state lottery even if the proceeds can only be used for the support of education. If this court is wrong, the General Assembly can reassert its will by merely repealing the multi-state lottery provisions at any time. If this court erred in the opposite manner, Ohio might have to withdraw from the multi-state lottery with some uncertainty as to when and if it could rejoin in conformance to the will of the General Assembly.

{¶ 134} Therefore, this court hereby DECLARES that the following sentence in H.B. 405, Section 36, is unconstitutional because it causes lottery proceeds to be used for purposes other than merely to support public education:

{¶ 135} "The Director of Budget and Management shall also decrease the fiscal year 2003 appropriation authority in the Department of Education GRF ALI 200–501, Base Cost Funding, by $41,000,000."

### Plaintiffs' Sixth Claim that H.B 405 Violates the Single–Subject Rule of the Ohio Constitution

{¶ 136} Plaintiffs argue that inclusion of the multi-state lottery provisions in H.B. 405 violates the single-subject rule of the Ohio Constitution. Section 15(D), Article II of the Ohio Constitution provides that "[n]o bill shall contain more than one subject, which shall be clearly expressed in its title."

{¶ 137} The Ohio Supreme Court has recently reviewed the rationale for the single-subject requirement:

{¶ 138} "[O]ne delegate to the Constitutional Convention of 1851 remarked:

{¶ 139} " 'It is well known that special charters are always "got through" our Legislature at will, and it must be evident that it always will be so, in the absence of a constitutional prohibition. When was there ever an instance within the recollection of the oldest legislator on this floor, where a single special act of incorporation was defeated—I mean an act applying to any subject matter embraced in this report. * * * It is but too generally known, that these "special acts" are "got through" by a log-rolling system as it is called, the friends of one

---

8. In this regard, the question of whether the General Assembly has adequately satisfied educational funding standards which the Ohio Supreme Court has found to be inherent in the Ohio Constitution is still pending. *DeRolph v. Ohio* (2001), 93 Ohio St.3d 628, 758 N.E.2d 1113.

"bill" voting for the bills of others, in consideration of their aid, when the final vote is taken upon his own. These acts will always pass a legislative body—the "dignity" and "purity" of your General Assembly to the contrary, notwithstanding. Any association of capitalists, who ask for a right of way, through any part of the country, will always get it, and ten thousand remonstrances might be sent up in vain. A single member could carry it through the Legislature, if each other member had had a bill of his own for similar acts of [incorporation].' I Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio (1851) 351.

{¶ 140} "One commentator, writing approximately sixty years later, identified the above quote as 'an illuminating exposition of the devious ways of legislatures sixty years ago.' Galbreath, Constitutional Conventions of Ohio (1911) 27.

{¶ 141} "Thus, as we explained in [*State ex rel.*] *Dix v.* [*Celeste*], *supra*, 11 Ohio St.3d [141] at 142–143, 11 OBR [436] at 438, 464 N.E.2d [153] at 155:

{¶ 142} " 'Ohio is one of among forty-one states whose Constitution contains a one-subject provision. The primary and universally recognized purpose of such provisions is to prevent logrolling—"* * * the practice of several minorities combining their several proposals as different provisions of a single bill and thus consolidating their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal of each minority could have obtained majority approval separately. * * *" '

{¶ 143} " 'The one-subject provision attacks logrolling by disallowing unnatural combinations of provisions in acts, *i.e.*, those dealing with more than one subject, on the theory that the best explanation for the unnatural combination is a tactical one—logrolling. By limiting each bill to a single subject, the bill will have unity and thus the purpose of the provision will be satisfied.' " *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062.

{¶ 144} The court went on to discuss the standards for applying the single-subject rule:

{¶ 145} "In attempting to define our role in the enforcement of the one-subject provision of Section 15(D), Article II of the Ohio Constitution, this court has been emphatic about its reluctance to interfere or become entangled with the legislative process. We have endeavored to 'accor[d] appropriate respect to the General Assembly, a coordinate branch of the state government.' *Dix, supra,* 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157. In so doing, we have recognized 'the necessity of giving the General Assembly great latitude in enacting comprehensive legislation by not construing the one-subject provision so as to unnecessarily restrict the scope and operation of laws, or to multiply their

number excessively, or to prevent legislation from embracing in one act all matters properly connected with one general subject.' *Id.* at 145, 11 OBR at 440, 464 N.E.2d at 157. We have emphasized that 'every presumption in favor of the enactment's validity should be indulged.' *Hoover v. Franklin Cty. Bd. of Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580, and noted that 'while this provision has been invoked in hundreds of cases in various jurisdictions, "* * * in only a handful of cases have the courts held an act to embrace more than one subject." ' *Dix,* 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157, quoting Ruud, 'No Law Shall Embrace More Than One Subject' (1958), 42 Minn.L.Rev. 389, 447.

{¶ 146} "On the other hand, we have been equally emphatic about not extending this reluctance to impede the legislative process so far as to negate the one-subject provision of Section 15(D), Article II of the Ohio Constitution. 'While this court has consistently expressed its reluctance to interfere with the legislative process, it will not, however, abdicate in its duty to enforce the Ohio Constitution.' *Dix,* 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157. See, also, [*State ex rel.*] *Ohio AFL–CIO v. Voinovich, supra,* 69 Ohio St.3d [225] at 229, 631 N.E.2d [582] at 586.

{¶ 147} "With these principles in mind, we have adopted the position that 'the one-subject provision is not directed at plurality but at disunity in subject matter.' *Dix,* 11 Ohio St.3d at 146, 11 OBR at 440–441, 464 N.E.2d at 158. See, also, *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 148, 580 N.E.2d 767, 770. Thus, 'the mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics.' *Hoover, supra,* 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580; *Ohio AFL–CIO, supra,* 69 Ohio St.3d at 229, 631 N.E.2d at 586. However, 'when there is an absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or legitimate reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical reasons, *i.e.,* logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purpose of the rule.' *Dix,* 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157. See, also, *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 507; *Hinkle, supra,* 62 Ohio St.3d at 148–149, 580 N.E.2d at 770; *Hoover, supra,* 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580." Id.

{¶ 148} *Simmons–Harris v. Goff* (1999), 86 Ohio St.3d 1, 711 N.E.2d 203, like the current case, involved application of the single-subject rule to an appropriations bill. In that case, the legislature had enacted provisions creating a school

voucher program by including them as a rider in a biennial appropriations bill. The court considered three factors and determined that inclusion of the school voucher provisions in the biennial appropriations bill violated the single-subject rule.

{¶ 149} The first factor was that the school voucher program was merely a rider on the bill unrelated to the other provisions of the bill. The court said:

{¶ 150} "The School Voucher Program allows parents and students to receive funds from the state and expend them on education at nonpublic schools, including sectarian schools. It is a significant, substantive program. Nevertheless, the School Voucher Program was created in a general appropriations bill consisting of over one thousand pages, of which it comprised only ten pages. See 146 Ohio Laws, Part I, 898–1970. The School Voucher Program, which is leading-edge legislation, was in essence little more than a rider attached to an appropriations bill."

{¶ 151} Whether a provision in an appropriations bill is a rider was treated as an important factor in the analysis in *Simmons–Harris*. On the one hand, the court recognized that an appropriations bill will necessarily cover a broad range of budgetary items related to appropriations:

{¶ 152} "We recognize that appropriations bills, like Am.Sub.H.B. No. 117, are different from other Acts of the General Assembly. Appropriations bills, of necessity, encompass many items, all bound by the thread of appropriations."

{¶ 153} At the same time, the court indicated that unrelated riders should not be attached to appropriations bills:

{¶ 154} "Riders are provisions that are included in a bill that is ' "so certain of adoption that the rider will secure adoption not on its own merits, but on [the merits of] the measure to which it is attached." ' *Dix*, 11 Ohio St.3d at 143, 11 OBR at 438, 464 N.E.2d at 156, quoting Ruud, 'No Law Shall Embrace More Than One Subject' (1958), 42 Minn.L.Rev. 389, 391. Riders were one of the problems the *Dix* court was concerned about. *Id.* The danger of riders is particularly evident when a bill as important and likely of passage as an appropriations bill is at issue. See Ruud at 413 ('The general appropriation bill presents a special temptation for the attachment of riders. It is a necessary and often popular bill which is certain of passage')."

{¶ 155} In *Simmons–Harris*, the court found that the inclusion of the school voucher program in an appropriations bill violated the single-subject rule because the school voucher provisions were a rider on the appropriations bill, unrelated to the other provisions of the bill, and that the school voucher provisions were "leading edge legislation" that presented constitutional issues.

{¶ 156} The current case is distinguishable from *Simmons–Harris* because the multi-state lottery provisions are not a mere rider on the bill. Rather, they are firmly related to the central appropriations core of the bill. The multi-state lottery provisions, which are expected to provide the state with $41,000,000 in new revenues, provide a significant source of funding for state appropriations. Hence, significant appropriations are dependent upon the passage of the multi-state lottery provisions. This provides a non-logrolling rationale for the inclusion of the multi-state lottery provisions in the appropriations bill.

{¶ 157} While it is true that the multi-state lottery provisions constitute leading-edge legislation that raise constitutional questions, and it is also arguable that it would have been wiser to give such matters full attention by including them in a separate bill, such considerations, by themselves, do not show that the inclusion of those provisions in an appropriations bill was the kind of egregious violation that warrants the interference of the courts. It might also be arguable that there are provisions in H.B. 405 that are so unrelated to either appropriations or the multi-state lottery that those other provisions should be regarded as mere riders. However, the practice to date has been to find such unrelated riders to be unconstitutional only when a case is presented in which they are at issue. So far as this court is aware, no court has yet ruled an entire appropriations bill unconstitutional because of the presence of unrelated riders. To do so would probably result in chaos. This court will not be the first to engage in such a practice.

{¶ 158} Consequently, the court hereby DECLARES that inclusion of the multi-state lottery provisions in H.B. 405 does not violate the Single–Subject Rule of the Ohio Constitution.

{¶ 159} Counsel shall submit a final judgment entry pursuant to Local Rule 25.01.

Judgment accordingly.