OPINION
{¶ 1} Thomas E. Brinkman appeals from the trial court's entry of summary judgment against him on his complaint for declaratory and injunctive relief against respondent Miami University and its board of trustees.
 {¶ 2} In his complaint, Brinkman sought a declaration that the university's policy of providing health insurance benefits to same-sex "domestic partners" of its employees violates Section 11, Article XV of the Ohio Constitution. He also sought injunctive relief to prevent the university from providing such benefits under its domestic-partner policy.
 {¶ 3} Two university faculty members, respondents Jean Lynch and Yvonne Keller, and their domestic partners, respondents Helenka Marculewicz and Susan Gray, intervened in the lawsuit and later moved for summary judgment on the basis that Brinkman lacked standing to sue. On November 20, 2006, the trial court sustained the intervenors' motion and entered judgment in favor of the university.
 {¶ 4} In his sole assignment of error, Brinkman contends the trial court erred in holding that he lacks standing to challenge the university's domestic-partner policy. Brinkman argues that he possesses common-law taxpayer standing because the university uses a portion of his tax dollars to pay for the benefits at issue. Alternatively, Brinkman claims he has common-law taxpayer standing because he pays tuition for his son and daughter, who attend the university. Finally, Brinkman asserts that he has "public-right" standing because the subject of his lawsuit is a matter of great public interest.
 {¶ 5} For the reasons set forth below, we conclude that Brinkman's status as an Ohio taxpayer does not give him standing to challenge the university's policy of providing health insurance benefits to same-sex domestic partners of its employees. We also reject Brinkman's argument that his payment of tuition on behalf of his adult children gives him *Page 3 
taxpayer standing. Nor are we persuaded that the public-right doctrine applies in this case. Accordingly, we will affirm the judgment of the trial court.
 {¶ 6} The facts relevant to the present appeal are undisputed. Brinkman is a citizen and taxpayer of the state of Ohio. His taxes constitute a portion of the state's general revenue fund. Brinkman has two adult children who attend Miami University, a public educational institution and instrumentality of the state. Brinkman makes tuition payments to the university on behalf of his adult children.
 {¶ 7} In June 2004, the Miami University Board of Trustees adopted a policy to extend health insurance availability to the same-sex domestic partners of benefit-eligible employees. For the 2004-2005 academic year, the premium for providing domestic-partner insurance coverage was $100,221, which represented .0527 percent of the total budget for faculty and staff compensation. For the 2005-2006 academic year, the premium was $110,612.
 {¶ 8} Miami University pays the premium for domestic-partner health insurance benefits out of its general disbursement account, which contains funds received from various sources, including tax money received from the state's general revenue fund. When the premium is paid, the university records the cost as an expenditure in its "current fund," which is the fund out of which most operating expenses at least initially are paid. The university's policy, however, is to reimburse the current fund for the premium cost at the end of the fiscal year, after the total cost is known, by charging the expense to the "unrestricted gift fund," which contains private donations. This reimbursement is done through an accounting entry that deducts the premium cost from the unrestricted gift fund and adds that amount back into the current fund. Due to an oversight, the reimbursement was not made for the premium costs incurred during the 2004-2005 school year.
 {¶ 9} To receive health insurance benefits for a domestic partner, an eligible *Page 4 
university employee must submit an "Affidavit of Same-Sex Domestic Partnership." In 2004, intervenor Lynch applied for and received heath insurance benefits for her domestic partner, intervenor Marculewicz. Likewise, in 2004, intervenor Keller applied for and received health insurance benefits for her domestic partner, intervenor Gray.
 {¶ 10} On November 2, 2004, Ohio's voters approved a marriage amendment to the state Constitution. The amendment reads: "Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage." The foregoing language became effective as Section 11, Article XV of the Ohio Constitution on December 3, 2004.
 {¶ 11} Brinkman filed the present lawsuit on November 22, 2005, seeking a declaratory judgment that the university's provision of health insurance benefits to same-sex domestic partners violates Section 11, Article XV and requesting a permanent injunction to bar the university from providing those benefits. As set forth above, the trial court found that Brinkman lacked standing to challenge the university's domestic-partner policy and entered summary judgment against him.
 {¶ 12} This court conducts a de novo review of a trial court's decision on summary judgment. Burgess v. Tackas (1998),125 Ohio App.3d 294, 296. A court may grant summary judgment only when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence submitted that reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C);Welco Indus., Inc. v. Applied Cos., 67 Ohio St.3d 344, 346,1993-Ohio-191. *Page 5 
 {¶ 13} On appeal, Brinkman first argues that he possesses common-law taxpayer standing because (1) he pays income tax into the state's general revenue fund, (2) Miami University receives money from the general revenue fund through state appropriations, and (3) the university uses some of the tax money it receives to pay the premium for its domestic-partner benefits. Brinkman contends these facts give him a sufficient interest in the litigation to confer standing to challenge the university's allegedly unlawful expenditures.
 {¶ 14} In response, Miami University asserts that Brinkman's payment of taxes into the state's general revenue fund does not give him standing to challenge its domestic-partner benefits policy. While echoing this argument, the intervenors also assert that Brinkman lacks taxpayer standing because the university does not use taxpayer money to pay the premiums at issue. Rather, the intervenors contend the university pays the premiums with unrestricted, private donations.
 {¶ 15} As a means of analysis, we turn first to the intervenors' argument that the domestic-partner benefits are not purchased with taxpayer money and, therefore, that Brinkman's status as a taxpayer does not confer standing. The trial court addressed this issue only briefly, concluding that "the money's source makes no difference." But if Miami University pays its domestic-partner insurance premiums with purely private donations, Brinkman's status as a taxpayer logically cannot give him standing to challenge the expenditure. See Lanham v. FranklinTwp., Clermont App. No. CA2003-07-057, 2004-Ohio-2071, ¶ 18 (recognizing that a plaintiff cannot maintain a common-law taxpayer action to enjoin illegal government spending if the funds involved were not derived from taxation). On the other hand, if taxpayer money pays the premiums, then we must engage in additional analysis to determine whether Brinkman's taxpayer status is sufficient to confer standing. *Page 6 
 {¶ 16} The uncontroverted evidence reveals that Miami University pays the premiums for its domestic-partner benefits out of a bank account that contains tax money received from the state's general revenue fund. This expense initially is charged to the university's current fund. As part of a well-recognized and accepted "fund accounting" practice, however, the university has a policy of deducting the cost of the domestic-partner benefits from an unrestricted gift fund, which contains private donations, and crediting the current fund by that amount at the fiscal year end. The net result of this process is that any taxpayer money spent on domestic-partner benefits ultimately is reimbursed with money raised through private donations to the school.
 {¶ 17} The intervenors argue that by making an accounting entry that debits the unrestricted gift fund and credits the current fund for the amount of the domestic-partner benefits, Miami University actually spends no tax dollars to provide those benefits. For his part, Brinkman contends "no Ohio court has ever maintained that reimbursing after-the-fact a fund containing taxpayer dollars with funds derived from private donations defeats taxpayer standing." Appellant's brief at 9, n. 22. He argues that, at a minimum, the university subsidizes the premium cost with tax money until reimbursement is made at the fiscal year end. Brinkman also points out that the reimbursement was not made for the premium costs incurred during the 2004-2005 school year. Finally, even setting aside the reimbursement issue, he insists that Miami University violated Section 11, Article XV merely by creating the legal status of "domestic partner" and recognizing that status.
 {¶ 18} Upon review, we do not dispute Brinkman's contention that no Ohio court has adopted the position advocated by the intervenors. On the other hand, Brinkman cites no Ohio case law directly on point either. Thus, the common-law taxpayer standing implications of Miami University reimbursing tax money taken from its current fund with private donations from its unrestricted gift fund appears to be an open question. We note, *Page 7 
however, that the Tenth District Court of Appeals addressed a similar situation in Andrews v. Ohio Bldg. Auth. (Sept. 11, 1975), Franklin App. No. 75AP-121. The appellant in Andrews claimed taxpayer standing to challenge the expenditure of public funds to construct an office tower. The Tenth District rejected her standing argument based, in part, on a finding that the project was not funded with taxpayer money. TheAndrews court noted that the project had been funded via a loan from the state workers' compensation insurance fund. The court also rejected the appellant's argument that taxpayer standing existed because the loans ultimately would be repaid using money from the state's general revenue fund. While conceding the persuasiveness of the appellant's argument, the Tenth District concluded, with little explanation, "that it would be inappropriate to look behind the initial fund acquired by loan and to trace the monies in payment thereof to this taxpayer."
 {¶ 19} In dissent in Andrews, Judge McCormac took issue with the majority's failure to look past the initial source of the funds. He reasoned: "If this holding were adopted as law, it would mean that a state agency or official could insulate itself from challenge of an illegal expenditure otherwise subject to general taxpayer attack by use of a loan from a third party or other imaginative two-step procedure, although the loan must be paid off by general taxpayer funds. The hazards of that holding are apparent on its face and should be rejected.The crucial issue is who must ultimately accept the burden of theexpenditure; and, in this instance, it is the general taxpayer * * *." (Emphasis added.)
 {¶ 20} Andrews presents the flip-side of the present case. It involved the expenditure of nontaxpayer money that eventually would be repaid with taxpayer funds. Here Miami University initially pays for domestic-partner benefits out of a fund that contains taxpayer money and later reimburses the fund with private donations. Nevertheless, the majority opinion in Andrews does support Brinkman's assertion that we *Page 8 
should look to the initial source of funding to determine whether taxpayer standing exists. Having reviewed Andrews, however, we are more persuaded by the dissenting viewpoint. Regardless of who initially pays for the domestic-partner benefits, we agree with Judge McCormac that "the crucial issue is who ultimately must accept the burden of the expenditure[.]" In Brinkman's case, that person is not the general taxpayer because private-party donations are used to replenish the taxpayer money spent by the university.
 {¶ 21} The Alabama Supreme Court addressed an analogous situation inBroxton v. Siegelman (2003), 861 So.2d 376. There the plaintiff, Broxton, filed a taxpayer action seeking declaratory and injunctive relief to stop the expenditure of funds to alter the grounds in front of the state capitol. The defendants, the governor and another state official, moved for summary judgment on the basis that Broxton lacked standing to bring the action. The trial court sustained the motion. On review, the Alabama Supreme Court reasoned that Broxton lacked standing because the state funds used to finance the project were reimbursed with federal grant money:
 {¶ 22} "Broxton argues that `[t]he major controlling factor of this Capitol [Landscaping] Project is the initial disbursement of State funds, not federal funds reimbursement,' and that `state funds were used (expended) and remained unreimbursed for a period of 4 to 7 months before being allegedly reimbursed with federal funds.' * * * The defendants counter this argument by stating that `[t]axpayer lawsuits challenge the expenditure of state tax funds[.] * * * While state funds are somehow utilized in reimbursement, they are not ultimately expended because they are replaced by federal funds.' * * *
 {¶ 23} "We agree with the position argued by the defendants. As stated above, the right of a taxpayer to sue `is based upon the taxpayer's equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused *Page 9 
by the misappropriation.' * * *
 {¶ 24} "As we view the holdings of our cases, it is this liability to replenish the public treasury through the payment of taxes that gives a plaintiff in a taxpayer's action standing. In this case, it is clear that federal funds were used to replenish the state funds that were temporarily used; because the taxpayer will not face the liability of replenishing the state funds, the trial court did not err in holding that Broxton does not have standing to sue. Broxton also argues that state funds are used, because at the moment of the reimbursement, the federal funds become state funds, and the property of the state. Again, this argument must fail, because as stated above, it is the liability to replenish public funds that gives a taxpayer standing to sue, and there is no question that here there is no liability to replenish state funds." Id. at 385 (citations omitted).
 {¶ 25} We discern no reason why the Broxton court's analysis, which we find to be persuasive, would not apply here. Miami University, an instrumentality of the state, temporarily used taxpayer money to pay the premiums for its domestic-partner benefits. Private-party donations subsequently were used to replenish the taxpayer money spent by the university. Under these circumstances, Brinkman cannot demonstrate any injury-in-fact based upon his status as a taxpayer. Without an injury-in-fact, he lacks standing to maintain this action.Wilmington City School Dist. Bd. of Edn. v. Clinton Cty. Bd. ofCommrs. (2000), 141 Ohio App.3d 232, 238.
 {¶ 26} Brinkman's observation that no reimbursement occurred during the 2004-2005 school year does not alter our conclusion. Miami University controller Dale Hinrichs provided uncontroverted deposition testimony establishing that the university's policy, going forward, is to deduct the cost of the domestic-partner benefits from the unrestricted gift fund and credit the current fund by that amount at the fiscal year end. We have no reason to question the existence of this policy or to believe that the planned *Page 10 
reimbursement of taxpayer money with private donations will not occur. Therefore, Brinkman's status as a taxpayer does not give him standing to seek prospective declaratory and injunctive relief to prevent his tax dollars from being used to finance the domestic-partner benefits. Based on the reasoning set forth above, we conclude that those benefits ultimately will be purchased with private-party donations rather than taxpayer funds.
 {¶ 27} We turn next to Brinkman's argument that Miami University violated Section 11, Article XV by creating the legal status of "domestic partner" and recognizing that status. Brinkman asserts that his lawsuit challenges not only the expenditure of money to purchase domestic-partner benefits but also Miami University's more fundamental acts of creating and recognizing the legal status of "domestic partner." Brinkman explained this argument in his memorandum opposing summary judgment as follows:
 {¶ 28} "Of course it should not be overlooked that the constitutional provision which the University is alleged to have violated prohibits the University from creating or recognizing a legal status for marriage-approximating relationships. Thus, independent of the question of whether the University's use of state tax dollars to fund domestic partner benefits gives rise to taxpayer standing, Plaintiff's standing as a taxpayer can most assuredly be said to derive from the undisputed fact that the University itself is funded by tax dollars, and thus its continuing recognition of the marriage-mimicking status (i.e., the `domestic partnership') — which recognition necessarily involves the expenditure of state tax dollars — is the cause of Plaintiff's constitutional injury and the target of his claim for injunctive relief."
 {¶ 29} We reject the foregoing argument for at least two reasons. First, we are unpersuaded by Brinkman's effort to divorce the university's creation and recognition of domestic-partner status from its purchase of insurance benefits. The purpose for Miami *Page 11 
University's creation of domestic-partner status is to provide benefits for the domestic partners of its employees. Moreover, the university recognizes domestic-partner status through the act of purchasing such benefits. Brinkman essentially concedes this point in his appellate brief, acknowledging that Miami University has created and recognized domestic-partner status "as a means of extending health benefits to the same-sex partners of [its] employees." Appellant's brief at 10. The domestic-partner status created and recognized by Miami University simply does not exist in a vacuum. Second, even assuming arguendo that we may segregate the university's creation and recognition of domestic-partner status from its act of purchasing domestic-partner insurance benefits, Brinkman still lacks standing.
 {¶ 30} "The question of standing is whether a litigant is entitled to have a court determine the merits of the issues presented." Ohio Contrs.Assn. v. Bicking, 71 Ohio St.3d 318, 320, 1994-Ohio-183. Whether undisputed facts confer standing to assert a claim involves a question of law that we review de novo. Cuyahoga Cty. Bd. of Commrs. v. State ofOhio, 112 Ohio St.3d 59, 62, 2006-Ohio-6499.
 {¶ 31} The standards governing taxpayer standing were addressed by the Ohio Supreme Court in State ex rel. Masterson v. Ohio State RacingComm. (1954), 162 Ohio St. 366, which remains the leading case on the issue:
 {¶ 32} "`Even in the absence of legislation, a taxpayer has a right to call upon a court of equity to interfere to prevent the consummation of a wrong such as occurs when public officers attempt to make an illegal expenditure of public money, or to create an illegal debt, which he, in common with other property holders of the taxing district, may otherwise be compelled to pay.'
 {¶ 33} "It is equally fundamental that at common law and apart from statute, a taxpayer cannot bring an action to prevent the carrying out of a public contract or the *Page 12 
expenditure of public funds unless he has some special interests therein by reason of which his own property rights are put in jeopardy. In other words, private citizens may not restrain official acts when they fail to allege and prove damage to themselves different in character from that sustained by the public generally. * * *" Id. at 368 (citation omitted).
 {¶ 34} Brinkman claims a proper interpretation of the foregoing language from Masterson compels a finding of that he has taxpayer standing. On the other hand, the intervenors and Miami University contend Masterson rejects the notion that taxpayer status, without more, confers standing to challenge the expenditure of general tax funds. The appellant in Masterson sought an injunction to prevent the Ohio State Racing Commission from spending public funds to conduct horse racing. The Ohio Supreme Court found that he lacked standing to sue. In reaching this conclusion, the court noted that the commission derived its revenue from certain individuals who paid money into a fund identified as the "state racing commission fund." Id. at 368-369. Because the appellant did not contribute to this special fund and the commission did not spend general taxpayer money, the Masterson court reasoned that the appellant lacked standing to sue. Id.
 {¶ 35} We find Brinkman's reliance on Masterson to be unpersuasive.Masterson established that if a challenged expenditure derives from a special fund, and if the plaintiff belongs to the class of individuals who contributed to the fund, the plaintiff has standing. In the present case, of course, Brinkman does not argue that any special tax was collected from him or that he was required to contribute to any dedicated tax fund from which Miami University purchases its domestic-partner benefits. Indeed, the only "special fund" involved here is the unrestricted gift fund, which the university ultimately taps to pay for domestic-partner benefits, and Brinkman admittedly did not contribute to that fund.
 {¶ 36} The essence of Brinkman's argument is that a taxpayer who contributes to *Page 13 
the state's general revenue fund has standing to challenge any general revenue expenditure, just as a contributor to a special fund of the type at issue in Masterson has standing to challenge an expenditure from that special fund. This analogy to Masterson, a "special fund" case, in situations involving taxpayer standing to challenge expenditures from the state's general revenue fund, has been adopted by the Tenth District Court of Appeals in a line of cases on which Brinkman relies. SeeState ex rel. United McGill Corp. v. Hamilton (1983),11 Ohio App.3d 102, 103; Corbett v. Ohio Bldg. Auth. (1983), 86 Ohio App.3d 44, 49;State ex rel. Paul v. Ohio State Racing Comm. (1989),60 Ohio App.3d 112, 115; Tiemann v. Univ. of Cincinnati (1998), 127 Ohio App.3d 312,321; Griffin Indus., Inc. v. Ohio Dept. Of Admin. Servs. (Aug. 2, 2001), Franklin App. No. 00AP-1139; see, also, Fankhauser v. Rhodes (Mar. 5, 1980), Clermont App. Nos. 810, 878.[1]
 {¶ 37} In an earlier case, however, the Tenth District had taken a different position. In Andrews v. Ohio Bldg. Auth. (Sept. 11, 1975), Franklin App. No. 75AP-121, the majority acknowledged the general rule that a taxpayer may bring an action to prevent the illegal expenditure of public funds.[2] The Andrews court also noted, however, that the general rule of taxpayer standing was not without limits. After observing Masterson's limitation that "private citizens may not restrain official acts when they fail to allege and prove damage to themselves different in character from that sustained by the public generally," theAndrews majority interpreted the case to mean that a taxpayer challenging expenditures from the state's general revenue fund, as opposed to some special fund, must show "that such complained of action has affected her pecuniary interests differently *Page 14 
than the general taxpaying public."[3] Id.
 {¶ 38} The Andrews court's interpretation of Masterson is consistent with the view subsequently expressed by Justice Wright in Racing Guildof Ohio v. Ohio State Racing Comm. (1986), 28 Ohio St.3d 317. In that case, a group of pari-mutuel clerks sued the Ohio State Racing Commission, seeking injunctive relief on a variety of grounds. The clerks asserted that they had standing based on their status as general taxpayers, contributors to a special fund, and members of the racing industry. The Racing Guild majority held that the clerks had standing as special-fund contributors because they financed the commission's operation through their payment of license fees into a special fund. Id. at 321. In light of this conclusion, the Racing Guild majority declined to address whether the clerks also possessed standing as general taxpayers. Id. at 322.
 {¶ 39} Although Racing Guild was decided solely on the basis of special-fund standing, we find noteworthy Justice Wright's opinion concurring in part and dissenting in part. After criticizing the majority for failing to address the issue of general taxpayer standing, Justice Wright analyzed the issue himself. After quoting the portion ofMasterson set forth above, he reasoned:
 {¶ 40} "Without question, Masterson requires at the very least that in a taxpayer's suit it must be demonstrated that the party initiating the action has a special interest whereby his own property rights are placed in jeopardy, and furthermore, it must be alleged that the taxpayer will sustain damage different in character from that suffered by the general public. It is this portion of Masterson which is excised from and ignored by the majority's opinion. *Page 15 
 {¶ 41} "* * *
 {¶ 42} "* * * [A]ssuming, arguendo, that the appellees' allegation of damage is not speculative, they have nevertheless failed to allege that their damage can be distinguished from the damage that will be sustained by all taxpayers who contribute to the General Revenue Fund. They have, therefore, failed to meet the test of standing imposed underMasterson. * * *." Id. at 324.
 {¶ 43} Upon review, we believe Justice Wright interpretedMasterson correctly,[4] as did the trial court in the present case. Although the issue perhaps is not without some doubt, we are unconvinced that Ohio law permits a taxpayer who contributes to the state's general-revenue fund to challenge any and all general revenue expenditure. As the intervenors note, such a broad common-law standing rule would subject most government actions to a taxpayer suit because most state activities are funded, in some way and to some degree, with general tax revenues. Such a rule also would run contrary to clear federal precedent, which Ohio courts regularly follow on matters of standing. See Michael E. Solimine, Recalibrating Justiciability in Ohio Courts (2004), 51 Clev.St.L.Rev. 531, 536 ("Many Ohio cases, both in the supreme court and the lower federal courts, have routinely followed standing doctrines developed in federal courts. Thus, Ohio courts have held that litigants must have `standing,' described in ways very similar to federal court jurisprudence[.]");[5] Hein v. Freedom From ReligionFoundation, Inc. (2007), 551 U.S., 127 S.Ct. 2553, 2559 ("It has long been established, however, that the payment of taxes *Page 16 
is generally not enough to establish standing to challenge an action taken by the Federal Government. In light of the size of the federal budget, it is a complete fiction to argue that an unconstitutional federal expenditure causes an individual federal taxpayer any measurable economic harm. And if every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus[.]"); DaimlerChrysler Corp. v. Cuno (2006), 547 U.S.,126 S.Ct. 1854, 1862-1864 (concluding that state taxpayers lack Article III standing to challenge state tax or spending decisions based solely on their status as taxpayers).
 {¶ 44} Obtaining guidance from both state and federal precedent is particularly appropriate here given that the key language inMasterson is consistent with language found in federal casesdenying taxpayer standing. For example, the Masterson court recognized that "private citizens may not restrain official acts when they fail to allege and prove damage to themselves different in character from that sustained by the public generally." Id. at 368. The trial court interpreted this to mean Brinkman must have suffered some individualized injury, distinct from the general injury experienced by everyone when the government spends taxpayer money unlawfully.
 {¶ 45} This reasonable interpretation of Masterson breaks no new ground in Ohio jurisprudence. See, e.g., State ex rel. Ohio Academy ofTrial Lawyers v. Sheward, 86 Ohio St.3d 451, 469-470, 1999-Ohio-123
(citing numerous cases for the proposition that "the private litigant must generally show that he or she has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general"). The trial court's interpretation ofMasterson also squares it with United States Supreme Court precedent such as Massachusetts v. Mellon (1923), 262 U.S. 447, 488, which rejected taxpayer standing absent evidence that a plaintiff "has sustained or is *Page 17 
immediately in danger of sustaining some direct injury * * *, and not merely that he suffers in some indefinite way in common with people generally." See, also, DaimlerChrysler, 126 S.Ct. at 1862 (noting that taxpayer standing to challenge expenditures from the treasury have been rejected because "the alleged injury is not `concrete and particularized,' * * * but instead a grievance the taxpayer `suffers in some indefinite way in common with people generally'"); Hein,127 S.Ct. at 2562-2563 ("The constitutionally mandated standing inquiry is especially important in a case like this one, in which taxpayers seek `to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.' * * * As a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable `personal injury' required for Article III standing[.]").
 {¶ 46} We note too that the trial court's interpretation ofMasterson is consistent with dicta from the Ohio Supreme Court inState ex rel. Dann v. Taft, 110 Ohio St.3d 252, 2006-Ohio-3677. In that case, the relator, Marc Dann, filed a mandamus action against the governor, seeking to compel disclosure of certain executive-branch reports. The issue in the case was whether the reports were privileged. In an effort to overcome the privilege argument, Dann asserted, inter alia, that he was considering filing a taxpayer's action to enjoin the unauthorized expenditure of public funds and that the reports were needed for that purpose. Id. at 253. The Ohio Supreme Court rejected the notion that taxpayer status would give Dann standing to pursue such an action:
 {¶ 47} "Dann's status as a taxpayer who paid taxes into the generalfund and paid gasoline taxes is shared by nearly all adult Ohiocitizens. There is nothing particularized about a need asserted on this basis. Nor would the fact that Dann may be contemplating the filing of a taxpayer suit alleging unspecified misconduct on the part of government *Page 18 
officials demonstrate a particularized need, because, in the absence of statutory authority, a taxpayer in his position lacks standing to file ataxpayer suit. State ex rel. Masterson v. Ohio State Racing Comm. (1954), 162 Ohio St. 366. * * *." Id. at 254 (emphasis added).
 {¶ 48} In response to Dann, Brinkman argues that the Ohio Supreme Court's dicta cannot serve "as a general expression of taxpayer standing jurisprudence." Be that as it may, the court did reject the notion that Dann would have common-law taxpayer standing to challenge the unlawful expenditure of public funds. Dicta or not, the Ohio Supreme Court's reliance on Masterson to reach this conclusion supports our determination that Brinkman likewise lacks taxpayer standing to challenge Miami University's expenditure of public funds.
 {¶ 49} We turn next to Brinkman's argument that he possesses taxpayer standing because he pays tuition for his adult children to attend Miami University. In their agreed statement of facts, the parties acknowledged that Brinkman does pay tuition to the university on behalf of his son and daughter. Although he asserted this basis for standing in his complaint, the trial court determined that he abandoned or waived it by not addressing his payment of tuition in response to the intervenors' summary judgment motion.
 {¶ 50} Upon review, we agree that the payment of tuition does not give Brinkman taxpayer standing to challenge the university's domestic-partner benefits program. Even setting aside the waiver issue,[6] we find no authority to support the proposition that *Page 19 
Brinkman's payment of tuition for his adult children gives him standing in this case. Unlike a taxpayer, who has a legal obligation to pay state income tax, Brinkman is not obligated by law to pay tuition to Miami University. Cf. Ohio Racing Comm., 60 Ohio App.3d at 117 ("It is a tenuous position asserted by appellant that he is somehow suffering a legal injury through his own voluntary conduct[.]"). In fact, the tuition bill is not even Brinkman's. The bill is the financial responsibility of his adult children, who are not parties to this action. Because Brinkman voluntarily makes tuition payments on behalf of his son and daughter, he remains free to withdraw his financial support if he disagrees with the university's policies. In any event, as noted above, the cost of Miami University's domestic-partner benefits ultimately is paid with unrestricted gift funds, not with tuition revenue. Therefore, we find no basis for affording Brinkman tuition-payer standing.
 {¶ 51} In a final argument, Brinkman asserts that he enjoys public-right standing because his lawsuit involves a matter of great public interest. In support of this contention, he cites State ex rel.Ohio Academy of Trial Lawyers v. Sheward, 86 Ohio St.3d 451,1999-Ohio-123, and other cases for the proposition that a court may dispense with the traditional standing requirements "when the issues sought to be litigated are of great importance and interest to the public[.]" Id. at 471.
 {¶ 52} The trial court rejected Brinkman's argument that recognition of public-right standing was appropriate in this case. In so doing, it reasoned that public-right standing is available only in extraordinary cases brought as original actions directly in the Ohio Supreme Court. On appeal, Brinkman disputes this proposition. He insists that public-right standing may be found in cases seeking declaratory and injunctive relief commenced in a common pleas court. *Page 20 
 {¶ 53} The Ohio Supreme Court has recognized public-right standing as a narrow exception to the traditional standing requirements. InSheward, for example, the court observed that "in the vast majority of cases" a plaintiff must have a stake in the outcome of the case, i.e., he or she must have suffered some direct and concrete injury, in order to have standing. Id. at 469. Unlike the federal courts, which are constrained by the standing requirements embodied in Section 2, ArticleIII of the United States Constitution, the Sheward court noted its ability "to dispense with the requirement for injury where the public interest so demands." Id. at 470. The Sheward majority opined that the Ohio Supreme Court "has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties." Id. at 471. TheSheward court then discussed a series of cases involving original actions to support the proposition that "the public action is fully conceived in Ohio as a means to vindicate the general public interest." Id. at 472-473.
 {¶ 54} Turning to the case before it, the Sheward court held that the relators had public-right standing to bring an original action in the Ohio Supreme Court challenging the constitutionality of sweeping tort-reform legislation. In finding public-right standing, the majority stressed that the relators raised separation-of-powers issues that were "of such a high order of public concern as to justify allowing this action as a public action." Id. at 474. The majority held that "where the object of an action in mandamus and/or prohibition is to procure the enforcement or protection of a public right, the relator need not show any legal or special individual interest in the result, it being sufficient that relator is an Ohio citizen and, as such, interested in the execution of the laws of this state." Id. at 475.
 {¶ 55} Later in its opinion, the Sheward majority noted that "[n]ot all alleged illegalities or irregularities" would be serious enough to confer public-right standing. Id. at *Page 21 
503. In fact, the court stressed that the public-right exception to traditional standing rules would be reserved for "the rare andextraordinary case" where "the public injury by its refusal will be serious." Id. at 503, 504 (citations omitted). Finally, the court stated that it would not entertain a public action to review the constitutionality of a legislative enactment unless it is of a magnitude and scope comparable to that of the tort-reform legislation at issue there. Id. at 504.
 {¶ 56} The Sheward court's analysis of public-right standing has been addressed in several other cases cited by the parties. See, e.g.,State ex rel. United Auto Aerospace Agricultural Implement Workers ofAm. v. Ohio Bur. of Workers' Comp., 95 Ohio St.3d 408, 415,2002-Ohio-2491 (Moyer, C.J., dissenting); State ex rel. Ohio AFL-CIO v.Ohio Bureau of Workers' Comp., 97 Ohio St.3d 504, 506, 2002-Ohio-6717;State ex rel. Leslie v. Ohio Hous. Fin. Agency, 105 Ohio St.3d 261, 270,2005-Ohio-1508; State ex rel. Kuhar v. Medina Cty. Bd. ofElections, 108 Ohio St.3d 515, 517, 2006-Ohio-1079. Although not all of these cases originated in the Ohio Supreme Court, they all involved original actions. In United Auto Aerospace, Chief Justice Moyer opined that "`Sheward carved out a very narrow exception for `the rare and extraordinary case' where the challenged statute operates `directly and broadly to divest the courts of judicial power.'" United AutoAerospace, 95 Ohio St.3d at 415 (Moyer, C.J., dissenting) (citation omitted). In the Ohio AFL-CIO case, the majority found public-right standing where a constitutional challenge to a drug-testing statute demanded "early resolution" and the statute implicated a fundamental right with "sweeping applicability." Ohio AFL-CIO, 97 Ohio St.3d at 506
(citation omitted). In Leslie, the court denied public-right standing where the relator alleged that the Ohio House Finance Agency had violated state law by making unauthorized loans. The court addressed the issue summarily, finding that "[t]his is also not a `rare and extraordinary case' warranting invocation of the public-right exception to *Page 22 
the personal-stake requirement of standing." Leslie,105 Ohio St.3d at 270 (citations omitted). In Kuhar, the court rejected the relator's effort to prevent a board of elections from conducting primary and general elections for municipal court clerk. In so doing, the court reasoned that "any possible limited exception to the general rule prohibiting an extraordinary action in mandamus to challenge the constitutionality of legislation is inapplicable because this is not a `rare and extraordinary' case in which the challenged statute operates `directly and broadly, to divest courts of judicial power.'"Kuhar, 108 Ohio St.3d at 517 (citation omitted).
 {¶ 57} In another case discussed by the parties, Bowers v. Ohio StateDental Board (2001), 142 Ohio App.3d 376, the Tenth District relied onSheward and other public-right cases to find that a dentist lacked standing to seek a writ of mandamus to compel a dental board to adopt regulations designating which examinations it would accept for licensing purposes. In finding no public-right standing, the Bowers court recognized that "[application of the public action rule of standing, however, is limited, and not all alleged illegalities or irregularities rise to that level." Id. at 381 (citation omitted). The court observed that "courts entertain such actions only where the alleged wrong affects the citizenry as a whole, involves issues of great importance and interest to the public at large, and the public injury by its refusal would be serious." Id. According to the Tenth District, "the vast majority of such cases involve voting rights and ballot disputes." Id.
 {¶ 58} Finally, in Ohio Roundtable v. Taft, 119 Ohio Misc.2d 49,2002-Ohio-3669, the Franklin County Common Pleas Court held that the plaintiffs had public-right standing to challenge the legality of Ohio's participation in a multi-state lottery. The plaintiffs in that case sought declaratory and injunctive relief as well as writs of mandamus. With little discussion of the public-right standing issue, the court opined that "the allegations *Page 23 
presented in this case are matters of great public importance." Id. at 62.
 {¶ 59} Having reviewed the law regarding public-right standing, we conclude that the trial court properly declined to apply the doctrine in Brinkman's case. Ohio case law makes clear that public-right standing is found overwhelmingly, if not exclusively, in original actions seeking extraordinary writs. Indeed, the cases cited by the parties all included requests for relief in mandamus. Even if public-right standing might be available in other contexts, judicial recognition of the doctrine plainly is correlated with the filing of an original action, which the present case is not.[7] We note too that public-right standing had been found to exist when a lawsuit demands "early resolution[.]"Ohio AFL-CIO, 97 Ohio St.3d at 506. We see no pressing need for speed in Brinkman's case.
 {¶ 60} Finally, and perhaps most importantly, we disagree with Brinkman's assertion that this is the "rare and extraordinary" case warranting invocation of the public-right exception to traditional standing rules. As noted above, the Sheward court indicated that the exception should be reserved for issues "of a magnitude and scope comparable" to the tort-reform legislation at issue there.Sheward, 86 Ohio St.3d at 504. The public interest at issue inSheward involved preservation of the separation-of-powers doctrine, which the majority believed to be under direct attack by the legislature. Id. at 474, 503. In that context, the Sheward court found it appropriate to recognize public-right standing "to protect the people's interest in keeping the judicial power of the state in those whom they vested it." Id. at 503. Even then, the majority stressed that not every garden-variety *Page 24 
separation-of-powers challenge would warrant recognition of public-right standing. The court limited such standing to "the rare and extraordinary case" in which the legislature "directly and broadly" acts to divest the judiciary of its power. Id. at 504. We see no public-interest threat of the Sheward magnitude arising from Miami University's decision to extend domestic-partner benefits to its employees. Even if the university's conduct violates Section 11, Article XV of the Ohio Constitution,Sheward makes clear that not every constitutional violation justifies the recognition of public-right standing. Id. at 503-504. Accordingly, we reject Brinkman's argument that he possesses public-right standing because his lawsuit involves a matter of great public interest.
 {¶ 61} Having rejected each of Brinkman's arguments, we overrule his assignment of error and affirm the judgment of the Butler County Common Pleas Court.
BRESSLER, P.J., and WALSH, J., concur.
(Brogan, J., of the Second District Court of Appeals, sitting by assignment of the Chief Justice of Ohio, pursuant to Section 5(A)(3), Article IV, of the Ohio Constitution.)
[1] When Fankhauser was decided, Clermont County was part of the First Appellate District.
[2] In particular, the Andrews court recognized that "`[e]ven in the absence of legislation, a taxpayer has a right to call upon a court of equity to interfere to prevent the consummation of a wrong such as occurs when public officers attempt to make an illegal expenditure of public money, or to create an illegal debt, which he, in common with other property holders of the taxing district, may otherwise be compelled to pay.'" Andrews, supra, quoting Masterson,162 Ohio St. at 368.
[3] The Tenth District subsequently reversed course in United McGillCorp. and adopted the reasoning of the dissenting judge inAndrews who refused to read Masterson as precluding a taxpayer from challenging the expenditure of general revenue funds to which he had contributed. United McGill Corp., 11 Ohio App.3d at 103.
[4] Although Justice Wright's analysis is found in the dissenting portion of his opinion, the issue he addressed there,Masterson's proper interpretation in the context of general taxpayer standing, was not decided by the majority. Thus, while we normally are not guided by the opinions of dissenting justices, we find nothing inappropriate about considering Justice Wright's views herein.
[5] We recognize, of course, that federal decisions on the issue of standing are not binding on Ohio state courts. Sheward,86 Ohio St.3d at 470. Nevertheless, "Ohio courts have long adopted, voluntarily, federal standing requirements." Solimine, Recalibrating Justiciability in Ohio Courts, 51 Cleve.St.L.Rev. at 541.
[6] Despite the trial court's ruling, we are not convinced that the waiver doctrine applied in the trial court. Brinkman alleged in his complaint that he paid tuition for his adult children, and the parties filed an agreed statement of facts confirming his allegation. Regardless of whether Brinkman actively opposed summary judgment on the tuition-payment issue, the intervenors still were required to demonstrate, as a matter of law, that standing based on tuition payment did not exist. See, e.g., Morris v. Ohio Cas. Ins. Co. (1988),35 Ohio St.3d 45, 47 (recognizing that "even where the nonmoving party failscompletely to respond to the motion, summary judgment is improper unless reasonable minds can come to only one conclusion and that conclusion is adverse to the nonmoving party"). Therefore, despite Brinkman's failure to address the tuition-payment issue in the trial court, his lack of a response, by itself, did not constitute an abandonment or waiver that automatically entitled the intervenors to judgment in their favor. Id. Nevertheless, for the reasons set forth above, we conclude that Brinkman's payment of tuition for his adult children did not give him standing in this case as a matter of law.
[7] The precise contours of public-right standing are not well defined in the case law. In fact, the doctrine itself "does not seem to be particularly well grounded in Ohio jurisprudence." Michael E. Solimine, Recalibrating Justiciability in Ohio Courts (2004), 51 Clev.St.L.Rev. 531, 542. "It is true, as reviewed by the majority in Sheward, that there are prior cases, all original actions in the court, which permit suits to proceed by claimants who at first blush appear not to satisfy traditional standing criteria. But until 1954, only one of the cases referred to a `public right,' and in any event the cases are not legion. Nor do they make convincing efforts to justify why there should be such an exception. The opinions use, with little discussion, vague terms such as the `importance' of an issue, or that there would be a `public injury' if suit could not proceed. Moreover, in Sheward the court took pains to emphasize how narrow the exception was." Id. at 542-543 (footnotes omitted). *Page 1